FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

APR 21 2009

GREGORY C. LANGHAM
CLERK

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 09 CV 00309 MSK-KMT

SUZANNE SHELL
    Plaintiff

v.

AMERICAN FAMILY RIGHTS ASSOCIATION, et al.

---

### MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FRCP 12(b)(6) and 12(b)(1)

---

**COMES NOW** the Defendant, Dee Contreras, and submits this Memorandum In support of her Motion to Dismiss Pursuant to FRCP 12(b)(6) and 12(b)(1), as follows:

### STATEMENT OF THE CASE

Ms. Shell claims that Dee Contreras is an individual, a member and an "agent"[1] of AFRA. Ms. Shell correctly does not allege that Dee Contreras is the owner, operator or controller of any website, AFRA owned or otherwise. Ms. Shell rightfully does not accuse Dee Contreras of directly participating in any alleged criminal activities, but claims that Dee Contreras was in a position to control such alleged activities, knew about them when they occurred, and did nothing to prevent them so as to be guilty by association.

---

[1] Ms. Contreras defines the word "agent" according to the common business understanding that an agent is a person who is authorized or employed to act on behalf of another person or entity to form contracts with third parties.

As to the alleged tortious activities, such as "false advertising" Ms. Shell claims that Ms. Contreras directly participated in these alleged activities to a degree that harmed Ms. Shell and/or her business, credibility and earning capacity in the "market(s)" in which Ms. Shell participates.

Further, Ms. Shell claims that Dee Contreras conspired with other defendants using a "pattern" of racketeering, with an intent to destroy Ms. Shell, in a manner which interferes with "commerce" by making false statements and shedding a false light on Ms. Shell's business, abilities and credibility so as to have an adverse effect on her business relationships and earning capacity.

Ms. Shell states correctly that in order for RICO claims to stand, there must be a legitimate Enterprise, separate and apart from defendants, with a distinctly separate hierarchy and structure under which the defendants operate to give the public appearance of legitimacy.

Ms. Shell makes the blanket allegation that all defendants are guilty of False and Misleading Advertising, which Ms. Shell contends caused injury to her and states that the defendants used in "commerce"[2], used a false designation of origin, any false description or representation in connection with Ms. Shell's goods or services, which are material and likely to influence the purchasing decision, that these statements were made in the course of business

---

[2] Commerce requires the buying and selling of products.

operations[3] and constitute the promotion of and/or representations of Ms. Shell's or the defendants' products[4], that these statements misrepresent the nature, characteristics, qualities, association, approval or origin of Ms. Shell's or the defendant's goods, that these acts are willful, fraudulent and intentional, and that these statements constitute false advertising[5].

## STANDARD OF REVIEW

"A complaint may be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) only if the plaintiff can prove no set of facts to support a claim for relief."

If, accepting all well-pleaded allegations as true, and drawing all reasonable references in favor of plaintiffs, it appears beyond doubt that no set of facts entitle plaintiffs to relief, then the court should grant a motion to dismiss. *See TriCrown, Inc. v. American Fed. Sav. & Loan Ass'n*, 908 F.2d 578, 582 (10th Cir. 1990).

A complaint must be dismissed if, accepting the allegations as true, it appears beyond doubt that Plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Meade v. Grubbs*, 841 F.2d 1512, 1526 (10th Cir. 1988).

---

[3] Business operations encompasses three fundamental **management imperatives** that collectively aim to maximize value harvested from business assets: (a) **Generate** recurring income. (b) **Increase** the value of the business (c) **Secure** the income and value of the business.

[4] In marketing, a product is anything that can be offered to a market that might satisfy a want or need

[5] Advertising is not the same as expressing a personal opinion.

# ARGUMENT

AFRA is an Interest Group[6], intended to provide forums for people who are seeking like-minded people for discussion and/or organizing activities to promote their cause and/or to provide emotional support to those who are going through child protection crises in their own lives.

Dee Contreras is an individual who became involved in a child protection case involving her grandchildren. One of the children was seriously injured in foster care, and Dee Contreras was mortified at the response of child protection services. In or about February of 2005, Ms. Contreras joined AFRA_EAGLE (n/k/a USA_EAGLE).

Upon joining AFRA_EAGLE and exploring what AFRA had to offer, Ms. Contreras found an article regarding her grandson's case which had been posted by "Christine". "Christine" stated that she had a client whose grandchildren had been in the same foster home in which Dee Contreras' grandchildren had been injured, so Dee Contreras contacted the webmaster for AFRA, Leonard Henderson. Mr. Henderson agreed to forward Dee Contreras' contact information to "Christine", and Christine Korn contacted Dee Contreras regarding same. Dee Contreras' intent in contacting Christine was to possibly meet and speak with the family of other children who were in the same foster home, as Dee Contreras had become the Conservator, through the courts, to maintain a lawsuit against Adams County et al., for the injuries to her

---

[6] An organized collection of people who seek to influence political decisions. It is a private organization that tries to persuade public officials to act or vote according to group members' interests.

grandson. Dee Contreras did, in fact, meet the family of the other children who had been in that same foster home. Under these circumstances, there was no reason for Dee Contreras to believe anything was amiss between Ms. Shell and AFRA.

At the time Dee Contreras met Christine Korn, Ms. Contreras had been working in law offices for approximately 18 years. Nothing Christine Korn explained while reviewing the case file of Ms. Contreras' son seemed to Ms. Contreras to be exceptionally valuable, nor secret, and was sometimes in opposition to the training Dee Contreras had received from attorneys. Dee Contreras has no interest in procuring information that she already possesses nor information which is inferior to the knowledge imparted by any of the attorneys for whom Dee Contreras has worked, nor the many with which she worked during the pendency of her son's case. In other words, Ms. Shell has nothing of value to offer Dee Contreras, and never did. Ms. Shell correctly has not accused Dee Contreras of "stealing" her trade secrets.

On or about June 22, 2006, Dee Contreras joined CenCom. At some time in July, Dee Contreras began to hear, on CenCom, that there were problems between Ms. Shell and AFRA. Ms. Contreras then openly disclosed that she was working with an associate of Ms. Shell (Christine Korn) in an attempt to try to bring Dee Contreras' grandson's case before legislators who might be able to assist in changing laws that might help protect foster children better. Dee Contreras asked if that was going to be a problem. A discussion ensued, and became very heated, and Dee Contreras quit all AFRA groups and all FRAI groups, maintaining limited contact with a few friends she had made in each side to the argument. Ms. Contreras then set

about asking questions of people involved both with the AFRA and the FRAI groups to ensure that Dee Contreras did not involve herself with anything unlawful.

After a due diligence research of the situation, Dee Contreras concluded that Ms. Shell's property had been commingled with that of AFRA for some time, and that it would be, at the least, nearly impossible to sort out which property belonged to whom. Dee Contreras had no obligation to research Ms. Shell's work so that she would be able to recognize it if she saw it posted anywhere, nor to seek out for Ms. Shell any property that might belong to Ms. Shell, nor to sort out the dispute between Ms. Shell and AFRA. Furthermore all of the allegations regarding copyright infringement, occurred before Dee Contreras became interested in child protection reform, or occurred on websites of which Dee Contreras was not a member and did not have access to, and these acts were committed by people Dee Contreras did not know. With regard to the alleged "ongoing" copyright infringement, this appears to be an allegation that those who are alleged to have infringed on Ms. Shell's copyrights never corrected those alleged infringements when confronted by Ms. Shell and this, in Ms. Shell's opinion, constitutes "ongoing" copyright infringement. Ms. Shell was never specific enough with Dee Contreras to be able to identify Ms. Shell's copyrighted works if she had seen them, but mentioned a few names Dee Contreras did not recognize, and named websites upon which she had found her copyrighted information. Dee Contreras was not a member of those websites and did not have access to the contents thereof, nor control over the persons nor websites allegedly involved.

Case No. 09-CV-00309-MSK-KMT
Memorandum in Support of Motion to Dismiss Dee Contreras

6

While doing her research, Ms. Kay Henson had informed Dee Contreras that most of the problems between AFRA and Ms. Shell were a result of "misunderstandings", and that Ms. Henson had also diligently attempted to help sort them out before giving up and choosing to associate herself with FRAI and Suzanne Shell. There were other things Ms. Henson told Dee Contreras that, combined with Ms. Contreras initial feeling toward Ms. Shell's Profane-Justice website, assisted Dee Contreras in making the decision that it would be in her best interests to keep herself distanced from Ms. Henson and Ms. Shell. For instance, Dee Contreras had seen on badadvocates.com, mention of Ms. Renee Cygan as having stolen from a "victim family" and Ms. Contreras was curious as to what had been stolen that would cause "the Editors" to launch such an intense campaign to destroy Ms. Cygan's reputation and ensure that she was ostracized by all advocates. Ms. Henson made the statement that she had seen what Taylor McLaren had (in the way of belongings) before she went to Renee's as well as what she had after she left Renee's, and she was positive Renee had stolen some of Ms. McLaren's belongings. Badadvocates.com stated that Ms. Shell had done the investigation and had determined that Ms. Cygan had indeed stolen Ms. McLaren's belongings. When Ms. Contreras asked why Ms. Shell did the investigation instead of contacting the police, Ms. Henson made the statement that it was because Ms. McLaren was in hiding. It was obvious from the conversation that Ms. Henson and Ms. Shell both were deeply involved in something Dee Contreras did not want to involve herself in, and she turned over the information to the FBI. Ms. Shell's assertions regarding "false reports" are that what the defendants said about her were false and were made with the sole intention of causing harm to Ms. Shell. Clearly that is not the case in this instance. Furthermore, making a report to an agency based on this sort of information is both prudent and responsible.

In order for a RICO claim to be sustained, the Defendants must be "organized" and have a definable hierarchy. Ms. Shell acknowledges this in her RICO claim, but does not define that hierarchy which makes the Defendants an "organization". Ms. Shell defines an Association-Fact Enterprise (which must be on organization separate from the defendants with a distinct hierarchy) as being the defendants and 12 additional people. Clearly this "Enterprise" is not separate from the defendants. Additionally, the hierarchy of the Association in Fact Enterprise is required to be explained in order for RICO to be updheld. *Libertad v. Welch*, 53 F.3d 428, 422 (1st Cir. 1995); see 18 U.S.C. § 1962(c) (2000).

In addition to establishing the existence of an enterprise, separate and apart from the defendants' organization, Ms. Shell needs to demonstrate that each defendant knowingly joined the enterprise; and that each defendant agreed to commit, or in fact committed two or more predicate acts as part of his/her participation in the Enterprise. 488 U.S. 852, 109 S.Ct. 138, 102 L.E.d.2d 110 (1988).

There are two types of enterprises: legal entities and associations-in-fact <u>United States v. Turkette</u>, 452 U.S. 576, 580581, 101 S.Ct. 2524-28, 69 L.Ed.2d 246 (1981). The Supreme Court has explained that in order to prove a RICO claim, a plaintiff must show both an "enterprise" and a "pattern of racketeering activity". The defendants' enterprise is an entity, or a group of persons associated for a common purpose, which has an ongoing and established hierarchy. This is proved by "evidence of an ongoing <u>organization</u>, formal or informal, and by evidence that the various associates function as a continuing unit." The Enterprise must be the "vehicle" through

which the unlawful pattern of racketeering activity is committed. The enterprise or organization must be defined.

"In addition, we have consistently held that the same entity cannot do "double duty" as both the RICO defendant and the RICO enterprise." See, e.g. *Miranda v. Ponce Federal Bank* 948 F.2d 41, 44-45 (1st Cir. 1991) The person or persons alleged to be engaged in racketeering activity must be entities distinct from the enterprise, *Odishelidze v. Aetna Life & Casualty Co.*, 853 F.2d 21, 23 (1st Cir. 1988) (per curiam). In other words, because the racketeer and the enterprise must be distinct, *Miranda*, 948 F.2d at 45, the enterprise must be an entity separate from the named defendants who are allegedly engaging in unlawful activity.

"Furthermore, we are mindful of the Supreme Court's admonition in NAACP vs. Claiborne Hardware Co., 485 U.S. 866, 930-932, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982), that <u>liability for mere membership in an association, particularly when that association is ideological, may conflict with the First Amendment</u>." (emphasis added) *Libertad v. Welsh*, 53 F.3d 428,442 (1st Cir. 1995); see 18 U.S.C. § 1962(c)(2000). In light of these constitutional concerns, it is particularly important that [Ms. Shell] present sufficient evidence, beyond [defendants"] similarity of viewpoint, rhetoric and strategy, to show an enterprise

In paragraph 174, Ms. Shell makes the claim that the defendants operate their own legitimate businesses. Obviously Dee Contreras does not operate her own legitimate business. She does not own, operate or control any business at all. Furthermore, those "businesses" Ms.

Case No. 09-CV-00309-MSK-KMT 9
Memorandum in Support of Motion to Dismiss Dee Contreras

Shell alleges to be legitimate, she also lists as RICO defendants. Clearly it is impossible for a business to function as a racketeer and still be a "legitimate business". Therefore these entities cannot be considered as the Enterprise. Where there is no Enterprise, no RICO exists. Also since one cannot be subjected to a RICO claim by virtue of being a member of AFRA, there can be no RICO claim against Defendant, Dee Contreras.

As to Ms. Shell's claims that AFRA has destroyed Ms. Shell's reputation, on about December of 2006, Colorado Confidential did an article about the reprimand Ms. Shell had recently received with regard to allegations of Unlicensed Practice of Law dating back to 2001. A public message board was posted and there was an overwhelming response. Ms. Shell posted to that message board, as did the so called "the Editors". Ms. Contreras was appalled at the negativity directed toward Ms. Shell. While Ms. Shell calls this "false advertising"-- expressing one's opinion on a public message board cannot be even loosely construed as "advertising". If it were, there would be no First Amendment Rights for anyone, and that is what all grassroots movements are about. It is obvious that as late as December of 2006, Ms. Contreras was supporting Ms. Shell's work on public websites. If this proves nothing else, it proves that all alleged criminal actions occurred well before Ms. Contreras became aware of any misdeeds.

Ms. Shell has been reprimanded for Unlicensed Practice of Law ("UPL") at least three times that Ms. Contreras is aware of. These things have harmed Ms. Shell's reputation in Colorado and made it difficult, if not impossible for her to work with legislators. This damage to Ms. Shell's reputation was caused by Ms. Shell's own behavior. Additionally, the attorneys

and/or judge in the UPL case made a statement that Ms. Shell's "work" is detrimental to her "clients". This information was reported by the media, not by AFRA nor Dee Contreras. This also has damaged her reputation, her ability to "work" in Colorado, and the confidence the general public has in Ms. Shell's work.

Until Ms. Shell contacted Ms. Contreras and asked her to refrain from posting anything further on the public message board, Ms. Contreras supported Ms. Shell's work. Ms. Contreras was under no obligation to stop posting on the public message board, and was continuing to learn about the dispute between Ms. Shell and AFRA through this interaction, so she continued participating in the conversation.

At one point, someone identifying themselves as "the Editors" posted what appeared to be a threat targeted at Renee Cygan. Ms. Cygan's ex-husband also identified himself and railed against Ms. Cygan. Shortly thereafter, the "threat" made by "the Editors" on Colorado Confidential, toward Ms. Cygan, was carried out on badadvocates.com. Additional demeaning, personal, information was posted on this public website against Renee Cygan, as "threatened" by the Editors. Additionally, "the Editors" began a campaign to defame and demean Ms. Contreras. Ms. Contreras attempted to discuss this by e-mail with Ms. Shell, who denied having anything to do with badadvocates.com, even though she is listed as the owner. Ms. Shell has consistently denied that she contributes to the publication, although in the California court case, Ms. Shell did admit that she does contribute. This caused Ms. Contreras to believe that Ms. Shell is, indeed a liar. Ms. Shell denied that she had any control over badadvocates.com yet stated in an e-mail

that she had devised a contract with "the Editors" that would allow her to "honestly" say that her hands are tied and she has no control. Ms. Contreras views this as dishonest activity intended to mislead the public. Ms. Shell then went on to say that if AFRA did her bidding, she could persuade "the Editors" to alter their publication and stated "that is in the contract." Ms. Contreras views this to be either extortion or blackmail. With these things in mind, it is clear that Ms. Shell has a good grasp on what constitutes Unfair Trade Practices, and how to hide those activities according to the true definition of RICO. Therefore, Ms. Contreras chose to disassociate herself with Ms. Shell.

One needs only review the first page of Badadvocates.com to see that every allegation Ms. Shell has made against AFRA is actually what Ms. Shell has DONE to AFRA. Even now, "the Editors" are "enhancing" their campaign against AFRA and AFRA members, and Ms. Shell is pointing the public, on a public domain familyrightsadvocacyimprovementproject, which is clearly controlled by herself and/or Ms. Kay Henson, and/or others who participate in the group to poke and prod at AFRA and the defendants herein named, and to further her campaign against those she views as competitors. Although out of one side of her mouth Ms. Shell screams "unfair, I am innocent", out of the other side of her mouth she says "you can't prove it so it doesn't exist."

Additionally, in 2002, Ms. Shell was removed from a legislative hearing in Colorado and has been barred from attending any future hearings. Her reputation with legislators is very obviously tainted, at least here in Colorado, and this occurred at least four to five years before

Dee Contreras became interested in working toward legislative changes to make foster care safer for Colorado's children.

In addition to these things, her own public website Profane-Justice displays Ms. Shell's work. When Ms. Contreras first came upon it in approximately 2005, Ms. Contreras declined to contact Ms. Shell because her website appeared to be more dissident than was comfortable for Ms. Contreras. Ms. Contreras believes this also plays a part in the decline in Ms. Shell's "business".

Contrary to Ms. Shell's statement that the defendants have boycotted her AND anyone associated with her, Ms. Rosemary van Gorder was introduced to Dee Contreras by Ms. Christine Korn at their first meeting. Ms. Van Gorder has kept e-mail contact with Dee Contreras, inviting Ms. Contreras to meetings set up by Ms. Van Gorder which might be mutually beneficial to the interests of Ms. Van Gorder and Ms. Contreras. While their interests are decidedly different, there are some areas of interest common to both. Ms. Contreras believes she has a good relationship with Ms. Van Gorder and enjoys accompanying Ms. Van Gorder and assisting her whenever possible, in making Ms. Van Gorder's endeavors more profitable in whatever way possible.

Additionally, all the defendants herein are aware that Dee Contreras does have a relationship with Ms. Van Gorder, and that Dee Contreras values this relationship. They

understand the nature of the relationship Dee Contreras has with Ms. Van Gorder and support what Dee Contreras has been able to do in working with Ms. Van Gorder.

## CONCLUSION

This lawsuit should be dismissed as to Dee Contreras because Ms. Shell has made no claims against Dee Contreras at all except that she is a member and an "agent" of AFRA.

Ms. Shell cannot hold Dee Contreras responsible for the acts and/or omissions of others, even if agency were to be proven, because Ms. Contreras did not control, own or have access to the alleged property or websites that property is alleged to have been on, particularly not in the absence of a valid RICO claim, and cannot be held responsible for the legal, moral or financial obligations of any other Defendant herein, pursuant to the Statute of Frauds, which requires that in order to do so, there must be a written, signed contract between the Defendants. Furthermore, Dee Contreras has not been accused of any direct infringement nor theft of trade secrets, nor RICO activities, nor any breach of contract. Ms. Shell correctly did not state that Ms. Contreras has any contracts with other defendants nor with Plaintiff.

Ms. Shell has not claimed that Dee Contreras stole any of her copyrighted materials, only that as an "agent" of AFRA she is responsible for the actions of others. Ms. Shell correctly has not claimed that Dee Contreras is or was the owner, operator or controller of any website, AFRA or otherwise that would give Dee Contreras the authority, nor the obligation, nor the right to confront any infringers, and could not be an "agent" of AFRA. These elements are necessary to

support a claim of Contributory Copyright Infringement, and/or Vicarious Copyright Infringement.

Where there is no contract, how can there be a breach of contract? If one does not know those who have breached contracts, how can one be held responsible for enticing those parties who did have contracts to breach them? Not all the defendants know each other, not all defendants know Ms. Shell's work, not all defendants were around in 2000 to be able to know some of this history.

Ms. Shell has failed to define the "Enterprise" sometimes calling AFRA a Defendant, sometimes saying that it is the Enterprise in itself. Ms. Shell submits that all persons and AFRA are "associated-in-fact" which does not support a RICO claim under 18 U.S.C. § 1961(4) because this Section defines the Enterprise as an association that is by definition always distinct from the group of individual defendants. The Courts have consistently held that the same entity cannot do "double duty" as both the RICO defendant and the RICO enterprise…The person or persons alleged to be engaged in racketeering activities must be entities distinct from the enterprise… 53 F.3d at 442. The court's deliberate use of the plural in framing the level of distinctness required under the RICO statute cannot be squared with the strained interpretation of that requirement urged by Ms. Shell. *U.S. v. Tillett*, 763 F.2d 628, 632 (4th Cir. 1985) (marijuana smuggling enterprise had a distinct organizational existence between acts of smuggling, by running a restaurant and purchasing equipment); *Chisholm v. Charlie Faulk Auto Wholesalers*, 851 F. Supp. 739 (E.D. Va. 1994) (enterprise engaged in mail fraud scheme involving nefarious

collection practices ran a legitimate car sales and financing business during those time periods other than when the predicate acts occurred).

Ms. Contreras does not own, operate or control a website upon which Ms. Contreras might "advertise" anything at all with regard to Ms. Shell, or to explain why Dee Contreras might want to "advertise"[7] "goods and services" Dee Contreras does not provide, in a alleged "market"[8] that does not exist, which interferes with "commerce" which cannot exist without a market, where goods and products might be purchased (using the common interpretations for those words) when she doesn't have a legitimate business in this alleged "market".

If I were looking for a book on how to beat child protection services, I would not have looked for an interest group to join and would not have found AFRA; and if I were looking for an interest group, I would not look in a book store where I might find Ms. Shell's goods available for purchase in an actual market. Therefore, Ms. Shell's assertion that I am competing with her holds no water. In the absence of competition, there is no motive for Unfair Trade Practices. Additionally, AFRA, even if it could be loosely defined as a "business" rather than an Interest Group, would not be in the same alleged "market" as Ms. Shell claims to be.

---

[7] An advertisement is not the same as an opinion expressed under the protection of the First Amendment Right to Freedom of Speech.

[8] A **market** is any one of a variety of different systems, institutions, procedures, social relations and infrastructures whereby persons trade, and goods and services are exchanged, forming part of the economy.

Ms. Shell is not an advocate because she was barred from assisting individuals with their court cases pursuant to a UPL case initiated in 2001, as noted on the Colorado Supreme Court website, four or five years before Dee Contreras became a member of AFRA_EAGLE. The attorney(s) and/or Judge in that case made the statement that Ms. Shell's "work" is detrimental to her "clients". Additionally, Ms. Shell was removed from a legislative hearing at the State Capitol in Denver in 2002 and is no longer allowed to attend legislative hearings.

Ms. Shell writes books and trains advocates, attorneys and judges her methods of dealing with child protection services. Dee Contreras has no interest in doing either of these things. AFRA does neither of these things, so how can she be in competition with Ms. Shell?

Ms. Shell has made a practice of claiming copyright infringement, conspiracy and/or RICO, habitually (Shell v. Devries D.C. No. 06-CV-00318-REB-BNB, Internet Archive 06-cv-01726-LTB-CBS, Tower v. Shell (Third Party Claim) Super. Ct. No. 06AS03504, and this case, Shell v. AFRA). Ms. Contreras believes that this practice, statements by attorneys and/or judges, and her own behavior and websites have drastically reduced Ms. Shell's credibility and public confidence in her work, and that this is the source of her losses, financially, in her business, and with the general public. If there are no losses, there are no damages. If there are no damages, no claim for damages will stand.

No harm has been done to Ms. Shell in the State of Colorado that she has not caused herself, therefore there are no damages Ms. Shell can claim.

WHEREFORE, the entirety of Plaintiff's Complaint should be dismissed as to Dee Contreras, for lack of a claim upon which damages can be made.

Respectfully submitted,

*B. Dee Contreras*

Date: April 17, 2009

B. Dee Contreras
Defendant

B. Dee Contreras
10571 Colorado Blvd., Apt. B-101
Thornton, CO 80233
Dee7020@aol.com