## RETURN OF SERVICE

| NAME OF SERVER: *Effie Belou* | TITLE: *Indifferent Third Party* |
|---|---|

Check one box to indicate appropriate method of service.

Aimee Dutkiewicz

[X] Served personally upon the defendant. Place where left: *18 Benham Street, Bristol, CT*

[X] Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint where left: *Mandolin Dutkiewicz*

[ ] Returned unexecuted::

[ ] Other (specify):

### STATEMENT OF SERVICE OF FEES

| TRAVEL $ *150.00* | SERVICES – *RUSH* $ *185.00* | TOTAL $ *335.00* |
|---|---|---|

### DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service is true and correct.

Executed on: *August 8th, 2009*
Date

*Effie Belou*
Signature of Server

*P.O. Box 149*
Address of Server

*Newtown, CT 06470*

**AFFIDAVIT OF COMPLETION OF PERSONAL SERVICE ON DEFENDANT
AIMEE DUTKIEWICZ**

I Effie Belou, a.k.a. Linda.Effie Bellas do state the following facts as true and correct to my knowledge and belief and if I were called to testify regarding facts stated herein, I would be competent to do so:

1. At or around 12:30 to 1:00 p.m. on Saturday, August 8, 2009, I did serve a summons and complaint to the dwelling of Aimee L. Dutkiewicz, located at 18 Benham Street, Bristol, Connecticut, regarding the action entitled Suzanne Shell v. American Family Rights, et al., of which Aimee Dutkiewicz is a named defendant.

2. I arrived at 18 Benham Street, Bristol, Connecticut at or around 12:20 p.m. and observed that there were two apartment doors at that address. Both outer doors were open.

3. Prior to my arrival, at around 12:15 p.m., I called the Bristol Police Department to preempt any false complaint of harassment by Aimee Dutkiewicz, since Aimee has a pattern of filing complaints against people she targets. The Bristol police declined to accompany me, stating that they cannot intervene in a civilian matter. I also brought along a video recorder to record the entire process of serving Aimee L. Dutkiewicz.

4. I went into the left door, which was the first floor apartment for 18 Benham Srreet, Bristol, Connecticut. I knocked and there was no reply.

5. The second entrance, which was open, led upstairs into a hallway. The passageway was fairly obstructed with glass bottles, cans, and other debris. There were witchcraft items like a black witch hat, a gray cape on a coat rack, a black pentagram, and a stuffed black raven that had an incense burner connected to it by a black chain. There were two glass bottles (one duct-taped due to prior damage) filled with seashells and a large plastic paint pail.

6. The upper hall had two doors. I wondered which was the correct door, and sat down in a chair in the hall, when I heard typewriter sounds coming from the first, decorated door.

7. I stood up and turned around to more carefully observe the second door to the left, but lost my balance and accidentally kicked the plastic pail/bucket that was laying near the two bottles in the hallway and it fell on top of the bottles of shells. I said "ow" because I had banged my leg which later bruised. The one bottle, whose

1

prior damage had been repaired with duct-tape, cracked open. I tried to pick up the pieces and move them to the side, which made a loud noise.

8. I then heard a voice (that belonged to 16 year old Garth Dutkiewicz) talking to a bird. The typewriter paused momentarily and its return signal resumed. Then Garth said to his twin sister, Mandolin: "Mandy, someone is banging stuff around out there. On the outer porch., I heard the wind chimes." I did not hear what Mandy replied but I heard Garth's reply "No, I ain't going out there."

9. As I continued to clear the broken glass from the entryway, I then heard the slide behind the peephole on the door, so I stood up by the door, it opened, and I recognized Mandolin Dutkiewicz. I handed Mandy the summons and complaint and she accepted it. While handing it to her, I stated to Mandolin that this was for her mom and that her mother had been served. She accepted the papers. I heard Garth, who was also in the room, shriek something. I then said "thank you", and left the premises. I stated on the recording of the videotape that the service to Aimee L. Dutkiewicz was perfected.

10. The next day, Sunday, I received a call from an Officer Vincent of the Bristol Police Department. He said that her former husband, and a co-defendant Tom Dutkiewicz had called the police and made a complaint. He said that he also talked to Aimee Dutkiewicz at her work at Comcast in Plainville, CT and then again when she was home.

11. Officer Vincent said that he had taken sworn statements from the two sixteen year old twins who were in the house and were eyewitnesses, and had obtained further information from Mr. and Mrs. Dutkiewicz. I knew some of the statements to be false, which the videotape corroborated. Mandolin Dutkiewicz falsely told the Officer that when she opened the door, she watched me purposely and maliciously kick the (broken and taped) bottle. They also said that I had thrown the brown envelope containing the summons and complaint at Mandolin Dutkiewicz and left in a huff. Officer Vincent said that he warns people before they sign the sworn statement, that if they sign it and it turns out to be false, they can be arrested.

12. I told the Officer that this was completely false and that I had videotaped the entire service of the complaint. He replied, "Let me get this right, you have video of the entire service." I told him about their false complaints, and that I had called the Bristol police department in advance, in order to avoid their anticipated retaliation, but was refused help. He had said if I had informed the front desk officer who had answered that there had been past trouble, they would have assisted me. I told him I wish that I had been told this information, but instead was declined, even after the front desk officer put me on hold to check if there was a possibility of help. Officer Vincent said he would have gladly accompanied me before the incident and said that they do this quite often when a person is in fear of retaliation. Officer Vincent said that he would go back to Ms. Dutkiewicz

with this new information that I had a videotape of the service and see what she would do. Officer Vincent asked if he could see the tape. I agreed. Officer Vincent said that he would get back to me to set up a time to see the tape after he informed Ms. Dutkiewicz that I had videotaped the service and see if that changed anything.

13. Officer Vincent called me back the week following August 8th, 2009 and said that Ms. Dutkiewicz said she was going to "call my bluff" regarding my videotaping the service of the summons and complaint I made to Ms. Dutkiewicz at her domicile. Officer Vincent told me he would call me back and let me know when I could meet with him. He did call me back and left a message that Saturday, August 15, would be a good time to view the tape.

14. I went to the Bristol Police Department. I told Officer Vincent that stumbling and kicking the pail, which damaged the already taped bottle, was an unfortunate accident, and suggested that she would not have left it on the floor of the cluttered entry, which was open to anyone's entry, if it was valuable. I showed him the bruise on my leg that I got from the large paint/spackle bucket. At that point in the conversation, Officer Vincent said he didn't think it was about the bottle, but instead, the Dutkiewicz's wanted me arrested. Then, the officers watched the videotape several times. They heard the conversation on the tape and all the sound it had recorded. They observed that the timeline the Dutkiewicz family gave didn't fit with the sights and sounds on the videotape but, instead, supported what I had said happened. Officer Vincent told me that he would finish investigating the next week and call me if not at the end of the week. If he didn't finish by the end of the week, then he'd contact me in two weeks because he'd be away the following week.

15. Officer Vincent called me early the next morning on Sunday to tell me that he declined to issue a warrant for my arrest, as Tom and Aimee Dutkiewicz were urging him to do. He said he did not see any criminal or willful intent but agreed it was an accident.

16. On August 22, 2009, Aimee L. Dutkiewicz contacted Attorney A. Hession in Springfield, MA with a threatening e-mail that she had made three reports to the Massachusetts Board of Bar Overseers. She further stated that she had filed police reports and requested restraining/no contact/orders against myself, Suzanne Shell and Attorney Hession from a Judge even though she was contacting him via this e-mail.

I declare the foregoing facts are true and correct to my belief and knowledge and sign under the pains of perjury under the laws of the United States.

Date:  August 26, 2009

Effie Belou, a.k.a. Linda Effie Bellas.

3