IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 09-cv-00309-MSK-KMT

SUZANNE SHELL,

      Plaintiff,

v.

LEONARD HENDERSON;
FAMILIES AT RISK DEFENSE ALLIANCE;
FRANCINE RENEE CYGAN;
ILLINOIS FAMILY ADVOCACY COALITION;
GEORGIA FAMILY RIGHTS, INC.;
NATIONAL ASSOCIATION OF FAMILY ADVOCATES;
CONNECTICUT DCF WATCH;
BRENDA SWALLOW; and
RANDALL BLAIR,

      Defendants.

_____

# OPINION AND ORDER
_____

**THIS MATTER** comes before the Court pursuant to Ms. Shell's Objections (**# 841**) to a

September 11, 2012 Minute Order (**# 838**) by the Magistrate Judge granting Mr. Henderson's

Motion to File a Document Under Restriction (**# 817**); Mr. Henderson's Motion to Clarify[1] (**#**

**870**) the Court's September 28, 2012 Opinion and Order (**# 861**), and Ms. Shell's response (**#**

**936**); Ms. Swallow's Motion to Dismiss (**# 901**), Ms. Shell's response (**# 937**), and Ms.

Swallow's reply (**# 943**); Ms. Swallow's Motion for Summary Judgment (**# 907**, as

---

[1]     To the extent this motion sought clarification of a typographical error in the Court's
September 28, 2012 Order, it was effectively granted by the Court's October 22, 2012 Order
(**#903**) deeming the prior Order amended to correct the mistake.  To the extent Mr. Henderson's
motion can be read as an attempt to re-argue the issues underlying the September 28, 2012
Order, such arguments are matters that were or could have been raised in Mr. Henderson's prior
briefing, and thus are an inappropriate basis for seeking "clarification."

supplemented **(# 908)**, Ms. Shell's response **(# 948)**, and Ms. Swallow's reply **(# 964**, as

supplemented **# 965)[2]**;  Ms. Shell's Motion for Default Judgment **(# 926)** against Defendants

Connecticut DCF Watch, Georgia Family Rights, Inc., Families At Risk Defense Alliance,

Francine Cygan, National Association of Family Advocates, and Illinois Family Advocacy

Coalition; Mr. Henderson's Motion for Summary Judgment **(# 934)**, and Ms. Shell's response **(#

975)**; Mr. Blair's Motion to Dismiss or for Summary Judgment **(# 993)**, Ms. Shell's response **(#

1131)**, and Mr. Blair's reply **(# 1154)**; and a series of Objections by Ms. Shell **(# 1027, 1073,

1114, 1124, 1168)** to various rulings by the Magistrate Judge.[3]

## FACTS

The Court assumes the reader's familiarity with the basic facts and extensive procedural

history of this case. The Court's September 28, 2012 Opinion and Order **(# 861)**, addressing

motions to dismiss Ms. Shell's Complaint, provides a useful summary.  The Court will elaborate

as appropriate in its analysis, but it is sufficient to observe here that Ms. Shell is the author of

various articles, letters, and other written materials intended to advise parents of their rights with

regard to investigations and actions by child protective services agencies.  Ms. Shell contends

---

[2]      Long after briefing of Ms. Swallow's motion was complete,Ms. Swallow filed a
"Supplement" **(# 1075)** to her motion, referencing two e-mail messages dated in 2006.  Ms.
Swallow does not address why she failed to address the messages in her initial motion or reply
brief.  As set forth below, although Ms. Swallow appears *pro se*, she is subject to the same
procedural obligations as litigants represented by counsel.  The Court does not permit parties –
represented or otherwise -- to repeatedly "supplement" at-issue motions whenever it occurs to
them to add new arguments or reference pre-existing evidence.  Thus, the Court has disregarded
Ms. Swallow's February 2013 "supplement."

[3]      The docket also reflects a filing by Ms. Swallow, captioned as a "Notice of Intent to
Appeal" a Magistrate Judge decision **(# 1089)**.  Assuming that Ms. Swallow intended this filing
to serve as substantive objections under Fed. R. Civ. P. 72(a), and not merely a notice of her
intent to make such a filing at some future point, the Court notes that the objections concern Ms.
Swallow's objection to appearing for a deposition that the Magistrate Judge ordered.  The record
indicates that the deposition has since been completed, rendering Ms. Swallow's objections
moot.

that her writings enjoy copyright and/or trade secret protection.  She publishes some of her materials on her web site, and distributes other materials to customers who pay to attend seminars she presents.  She contends here that each of the Defendants have obtained and re-published her written materials, without her consent and in violation of her various legal rights in the writings.

## ANALYSIS

### A.  Standard of review

All of the remaining parties to this case appear *pro se*.  Accordingly, the Court construes all of their pleadings liberally.  *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972).  However, such liberal construction is intended merely to overlook technical formatting errors and other defects in the parties' use of legal terminology and proper English.  *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  *Pro se* status does not relieve the parties of the duty to comply with the various rules and procedures governing litigants and counsel or the requirements of the substantive law, and in these regards, the Court will treat the parties according to the same standard as counsel licensed to practice law before the bar of this Court.  *See McNeil v. U.S.*, 508 U.S. 106, 113 (1993); *Ogden v. San Juan County*, 32 F.3d 452, 455 (10th Cir. 1994).

### B.  Ms. Shell's Motions for Default Judgment

In the Court's September 28, 2012 Order **(# 861)**, the Court noted that there had been no meaningful recent proceedings against several Defendants – namely, Families At Risk Defense Alliance; Francine Cygan; Illinois Family Advocacy Coalition; Georgia Family Rights, Inc.; and National Association of Family Advocates – and indeed, that Ms. Shell had obtained an Entry of Default against most of these Defendants.  The Court noted Ms. Shell's obligation to diligently prosecute her claims, and thus directed that, within 30 days of the September 28, 2012 Order,

Ms. Shell either move for default judgment against these Defendants, dismiss her claims against these Defendants, or otherwise show cause why her claims against these Defendants should not be dismissed for failure to prosecute.  The Court further advised Ms. Shell that, if she chose to seek default judgments against the Defendants, she was obligated to "demonstrate the basis for this Court's exercise of personal jurisdiction over these Defendants," as the Court's prior orders in this action often addressed its lack of personal jurisdiction over many of the parties Ms. Shell had named.

On December 17, 2012, Ms. Shell filed a Motion for Default Judgment (**# 926**) against the Defendants listed above.  She did not previously request an extension of time of the October 28, 2012 deadline (the 30-day period granted by the Court in its September 28, 2012 Order), nor does her motion recite any circumstances that explain why her motion was filed nearly 60 days after the Court's deadline for filing the motion had passed.  Although, as noted above, the Court is mindful of Ms. Shell's *pro se* status, such status does not relieve her of the obligation to abide by the same procedural requirements imposed on any litigant, represented or not.  Because Ms. Shell's Motion for Default Judgment is untimely, the Court declines to consider it.  Ms. Shell did not timely perform any of the actions directed by the Court's September 28, 2012 Order, and accordingly, the Court finds that Ms. Shell has failed to diligently prosecute her claims against Defendants Families At Risk Defense Alliance; Francine Cygan; Illinois Family Advocacy Coalition; Georgia Family Rights, Inc.; and National Association of Family Advocates. Accordingly, the claims against those Defendants are dismissed pursuant to Fed. R. Civ. P. 41(b).[4]

---

[4]      Notwithstanding its untimeliness, the Court has nevertheless reviewed Ms. Shell's motion and accompanying affidavit.  Were the Court to consider the motion on its merits, it would nevertheless find that Ms. Shell has failed to adequately demonstrate this Court's personal

### C. Ms. Swallows' Motions

The Court finds it appropriate to address the various Defendants' motions by grouping them according to the moving Defendant. The Court first begins with motions by Defendant Swallow. Ms. Swallow moves both to dismiss **(# 901)** Ms. Shell's claims against her, and moves for summary judgment **(# 907)** in her favor.[5]

Before turning to Ms. Swallow's motions, it may be helpful to recap the proceedings to date. The Court's March 31, 2010 Order denied Ms. Swallow's initial motion to dismiss the claims against her for lack of personal jurisdiction, finding that Ms. Shell had made a *prima facie* showing that this Court had personal jurisdiction over Ms. Swallow. The Court's September 28, 2012 Order granted in part and denied in part Ms. Swallow's motion to dismiss Ms. Shell's

---

jurisdiction over many of the entity defendants. Ms. Shell repeatedly contends that certain individual (former) Defendants' "conduct was inextricably linked with [the entity Defendant] to the point where it is impossible to distinguish [the individual's] personal conduct from [the entity's] conduct." This is a purely conclusory assertion; the question of when an entity can be held liable for the conduct of individuals present factually-intensive and legally-complex issues that cannot be resolved simply on a party's decision to unilaterally equate them. Ms. Shell thereafter does not always distinguish between the acts of an individual and the acts of the Defendant entity. *See e.g. Docket* # 926-1 at ¶ 25 (alleging that Defendant Georgia Family Rights, Inc. "had tampered with my . . . database," despite the fact that a legal entity, in and of itself, lacks the capability to "tamper" with anything, and that only individuals can perform such acts); ¶ 45 (Defendant Families At Risk Defense Alliance "requested attendees to my seminars . . to provide him with the information they received," again ascribing an act committed by an individual to the Defendant entity, without an adequate showing that the entity may be held liable for the individual's acts).

[5]     All of the parties in this case have been prolific filers, and the docket currently exceeds 1,170 entries. Consequently, this Court will limit its analysis of all substantive motions to a review of the motion, the response to that motion, the reply to that response, and any exhibits that are either attached to the motion papers or, where the motion papers reference previously-filed exhibits, those that are specifically identified by docket and exhibit number. The Court acknowledges exhibits or assertions that the Court characterizes here as not being part of the record may have been submitted as part of other docket entries, but the sheer volume of the filings in this action prevents the Court from seeking out those documents on its own. *See generally Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these materials, but is not required to do so. If the rule were otherwise, the workload of the district courts would be insurmountable").

claims against her for failure to state a claim.  Specifically, the Court found that Ms. Shell's

claims against Ms. Swallow for misappropriation of trade secrets, breach of contract, and

copyright infringement would proceed.  (All three claims appear to derive from a contention by

Ms. Shell that Ms. Swallow obtained Ms. Shell's written materials by attending a seminar hosted

by Ms. Shell, at which Ms. Swallow allegedly signed – and subsequently breached – an

agreement not to disclose the written materials.)  The September 28, 2012 Order expressly noted,

however, that Ms. Shell's copyright infringement claim was insufficiently specific, and the Court

directed that Ms. Shell file a supplemental statement that: (i) identified, by title and description,

each document on which Ms. Swallow allegedly infringed Ms. Shell's copyright; (ii) identified

the facts demonstrating registration of that copyright; and (iii) explained "how, when, and by

whom . . . the alleged infringement occurred."  Ms. Shell's supplemental statement **(# 872)**

makes two specific references to Ms. Swallow: (i) Ms. Swallow "published the Florida seminar

handout on the bashingshell Yahoo! group . . . This document was a proprietary document

containing trade secrets at the time she published it in April 2006"; and (ii) "In April 2006,

Swallow also gave a copy of the Florida seminar handout to William Wiseman for the express

purpose of publishing it on his web site."  The supplement contends that the "Florida seminar

handout" was "registered as part of the collection of Unpublished Proprietary Documents

registered [with the U.S. Copyright Office] October 23, 2008."

      1.  <u>Motion to dismiss</u>

      With that background in place, the Court turns to Ms. Swallow's Motion to Dismiss.  She

contends that: (i) Ms. Shell's supplement indicates that she had not registered a copyright on the

materials in question at the time of the alleged infringement in 2006, and that Ms. Shell has not

identified any other alleged copyrights that Ms. Swallow allegedly infringed; (ii) Ms. Shell's

claim for breach of contract against Ms. Swallow is barred by the statute of limitations; and (iii) various arguments concerning the breach of contract claim that have already been (or could have already been) presented to and considered by the Court.

Because Ms. Swallow's motion is presented as one for dismissal on the face of the pleadings, the Court construes the allegations in Ms. Shell's Complaint (as supplemented) in the light most favorable to Ms. Shell, and can dismiss Ms. Shell's claims only if they are facially defective. *Smith v. U.S.*, 561 F.3d 1090, 1098 (10th Cir. 2009).

Turning first to the copyright infringement claim, the Copyright Act requires that authors register their works before suing for copyright infringement. *Reed Elsevier, Inv. v. Mucknick*, 130 S.Ct. 1237, 1241 (2010), *citing* 17 U.S.C. § 411(a) ("no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title"). However, although registration is a precondition to suit, it is not a precondition to infringement; in other words, copyright protection attaches to a work upon its initial publication, regardless of whether it is registered or not. *JCW Investments, Inc. v. Novelty, Inc.*, 482 F.3d 910, 914 (7th Cir. 2007). However, an author's failure to register a copyrighted work until after infringement has already begun operates to deprive the author of several valuable remedies, including the right to obtain statutory damages or attorney's fees for the infringement. 17 U.S.C. § 412(1); *see Latin American Music Co. v. American Society of Composers, Authors, and Publishers*, 642 F.3d 87, 90 (1st Cir. 2011); *Polar Bear Productions, Inc. v. Timex Corp.*, 384 F.3d 700, 707 n. 5 (9th Cir. 2004). Thus, although Ms. Shell's failure to register the copyright to the "Florida seminar handout" until after Ms. Swallow had already allegedly infringed it prevents Ms. Shell from recovering statutory damages from Ms. Swallow, Ms. Shell may still potentially recover her actual damages from Ms.

Swallow's infringement, as well as any profits that Ms. Swallow earned by virtue of that infringement.[6]  Accordingly, Ms. Shell's delay in registering the copyright to the allegedly infringed materials does not warrant dismissal of her copyright claim against Ms. Swallow.

Ms. Swallow also contends that Ms. Shell's breach of contract claim against her is untimely.  Ms. Shell's Complaint (**# 1**) states that "On March 11, 2005, Brenda Swallow, as a condition of attending my training seminar, entered into an express contract wherein she agreed not to copy or distribute any written handout."  ¶ 135.  Although the Complaint indicates that the seminar took place in Fort Lauderdale, Florida, neither the Complaint nor Ms. Swallow's motion (nor, for that matter, Ms. Shell's response) elaborates on the terms of the contract or, importantly, identifies which jurisdiction's law governs the contract's enforcement.

Hypothetically, if the jurisdiction where the contract was allegedly made supplies the governing law – that is, Florida – the statute of limitations for bringing a contract claim is five years, measured from the date that Ms. Swallow allegedly breached the contract (regardless of when Ms. Shell discovered that breach).  Fl. Stat. § 95.11(2)(b); *Clark v. Estate of Elrod*, 61 So.3d 416, 418 (Fl.App. 2011) ("a cause of action for breach of contract accrues and the limitations period commences at the time of the breach").  Given that Ms. Swallow could not have breached the contract any earlier then the date of the seminar in 2005, Ms. Shell's breach of contract claim, commenced in February 2009, is nevertheless within the 5-year limitations period provided by Florida law.

On the other hand, if Colorado law governs Ms. Shell's breach of contract claim, the applicable statute of limitations for a breach of contract is generally three years, measured from

---

[6]      The Court expresses no opinion as to whether Ms. Shell is likely to be able to demonstrate  any actual damages or profits earned by Ms. Swallow from the infringement in the circumstances presented here.

the date on which Ms. Shell discovered (or, with reasonable diligence, should have discovered)

the breach.  C.R.S. § 13-80-101(1)(a) (3-year statute); C.R.S. § 13-80-103.5 (6-year statute for

contracts with liquidated damages); C.R.S. § 13-80-108(6) (accrual).  Assuming that Ms. Shell's

supplement, which identifies the date of Ms. Swallow's breach as April 2006, is an allegation by

Ms. Shell that she discovered Ms. Swallow's breach at that time, her commencement of a breach

of contract claim against Ms. Swallow in February 2009 is also timely under Colorado law's 3-

year limitations period.  Ms. Swallow has not asserted any facts that would suggest that Ms.

Shell should reasonably have discovered the alleged breach earlier.  Thus, regardless of which

jurisdiction's law applies, Ms. Shell's breach of contract claim appears to have been timely

asserted.

Ms. Swallow does not argue that a jurisdiction other than Colorado or Florida provides

the law governing the breach of contract claim, nor does she otherwise articulate the basis for her

belief that the claim is untimely.  Accordingly, the Court denies Ms. Swallow's Motion to

Dismiss.

### 2. Summary judgment

Ms. Swallow also moves for summary judgment, arguing: (i) with regard to the

misappropriation of trade secrets claim, Ms. Shell "has testified that she did NOT treat this

information as secret," that she "failed to show an improper use by failing to allege anything

more than conclusory allegations," and that she "failed to prove any losses at all"; (ii) with

regard to the copyright infringement claim, that the work in question was not registered at the

time of the alleged infringement, that Ms. Shell "as failed to allege any facts that a valid

copyright was violated through copying of any original copyrighted works of hers by [Ms.

Swallow]," and that her claim is barred by the statute of limitations and the doctrine of laches;

and (iii) with regard to the breach of contract claim, that Ms. Swallow cannot show that a contract existed, that Ms. Shell performed as required by that contract, or that Ms. Swallow breached that contract. However, Ms. Swallow did not supply any evidentiary material demonstrating her factual contentions. (Nor, for that matter, did Ms. Shell submit any evidentiary material supporting her response.)

Both parties misunderstand what is necessary to make or oppose a motion for summary judgment. A party making or responding to a summary judgment motion may not simply assert that a given fact exists; rather, the party must "cit[e] to particular parts of materials in the record, including depositions, documents, [or] affidavits" that establish that fact. Fed. R. Civ. P. 56(c)(1)(A).[7] In other words, a party asserting that a particular fact does or does not exist for summary judgment purposes must supply the Court with some evidentiary material – a deposition transcript, or a document, or an affidavit from a person with personal knowledge of that fact – that supports the contention. *See e.g. U.S. v. Simons*, 129 F.3d 1386, 1388-89 (10th Cir. 1997). For example, Ms. Swallow's motion states that "Ms. Shell has testified that she did NOT treat this information as secret," but Ms. Swallow does not attach a transcription of such testimony by Ms. Shell (much less identify the context in which Ms. Shell's alleged statement to this effect was made). Similarly, Ms. Shell's response asserts a variety of conclusory statements about the "trade secrets" – that they "were a unique body of work" and are not the same information contained in books published by Ms. Shell – but does not attach the seminar handout

---

[7]     A party asserting the absence of a particular fact obviously cannot point to depositions or documents that demonstrate that fact. In such circumstances, the party must point to evidentiary materials "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). For example, for Ms. Swallow to demonstrate her contention that Ms. Shell cannot establish the existence of a contract, Ms. Swallow might point to a (hypothetical) interrogatory in which she asked Ms. Shell to produce any alleged written contract, to which Ms. Shell responded that she could not do so. Thus, a movant can point to evidence that establishes the <u>absence</u> of a particular fact.

in question, set forth its contents in any particular detail, or otherwise provide information in sufficient specificity that the Court could meaningfully consider whether the handout is indeed entitled to protection as a trade secret.  Both sides' allegations are far too conclusory and argumentative for the Court to treat them as affidavits, as it might otherwise do when a *pro se* party attempts to offer a narrative factual recitation.

Because neither party has supported their summary judgment papers with sufficient evidentiary material, nor even recited their factual positions with sufficient specificity to permit the Court to treat them as affidavits, the Court denies Ms. Swallow's summary judgment motion. The claims against Ms. Swallow will proceed to trial.

The Court will conduct a Pretrial Conference at **1:30 PM** on **July 25, 2013**, in anticipation of a jury trial commencing in early September 2013.  Given the nature of this case, including the parties' *pro se* status, the Court relieves the parties of the existing requirements for submission of a proposed Pre-Trial Order, and instead directs as follows.  On or before **July 1, 2013**, Ms. Swallow and Ms. Shell shall each file: (i) a narrative statement setting forth what they will testify to regarding their recollections about the 2005 Fort Lauderdale seminar, any agreements signed by Ms. Swallow at such seminar, the handouts distributed during that seminar, and the use to which Ms. Swallow put such handouts in or about April 2006; (ii) a list of the witnesses that they intend to call in their case, along with a brief statement of the facts they believe any listed third-party witness would testify to; (iii) a list of all documentary exhibits that they intend to present at trial, along with a copy of each such exhibit; and (iv) a copy of all proposed jury instructions that they request that the Court give.

Accordingly, Ms. Swallow's motion to dismiss and motion for summary judgment are denied.

### D.  Mr. Henderson's motion

Mr. Henderson moves for summary judgment on Ms. Shell's claims against him, arguing: (i) with regard to the copyright infringement claim, that the allegedly infringing documents identified by Ms. Shell's supplement had been published on a message board as early as July 2002 and that Ms. Shell was aware of and tacitly abided such publication,  that notices attached to such documents granted users the opportunity to copy and distribute them, and that Ms. Shell's copyright claim is untimely; (ii) with regard to the contributory copyright infringement claim, Ms. Shell cannot show a cognizable direct copyright infringement by another person, and thus, cannot show any contributory infringement by Mr. Henderson; and (iii) that Ms. Shell's lacks evidence to support any of the elements of her claim of unfair trade practices, and that such claim is untimely in any event.

### 1.  Summary judgment standard

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Kaiser Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a

court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial.  *See Garrett v. Hewlett Packard Co*., 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence.  See Fed. R. Civ. P. 56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material fact, no trial is required.  The court then applies the law to the undisputed facts and  enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a prima facie claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

2.  General factual background

The Court confesses that it is unable to offer a complete factual background regarding the claims at issue.  The parties often forget that their personal familiarity with the underlying events

outpaces the Court's, and as a result, the parties' briefing mistakenly assumes the reader's level of familiarity with persons, organizations, and other underlying matters.[8]

According to the record, Ms. Shell and Mr. Henderson, along with other Defendants (both present and former), are individuals with particular interests in the legal issues involving state child protective services agencies. Ms. Shell had an extensive interest in the subject and, by 2002, had written several books on the subject. Mr. Henderson also shared an interest in the subject, and at some point in time, assumed a management role within an organization called the "American Family Rights Association" or "AFRA."

According to the deposition testimony of Gregory Hession, attached to Ms. Shell's summary judgment response, AFRA "had a number of informational websites to provide parents and family advocates with information on how to fight cases in the child protective services area." In addition, AFRA engaged in lobbying on child protective services issues, published brochures, held conferences, and formed various state chapters (who maintained additional websites). Evidence in the record from both Mr. Henderson and Mr. Hession indicate that Mr. Henderson created AFRA and served as its President until January 2006, after which Mr. Hession briefly served as AFRA President until March 2006, and then William Tower assumed the office.[9] AFRA leadership also involved a "board" consisting of several additional

---

[8]     Again, the Court emphasizes that its examination of Mr. Henderson's motion and Ms. Shell's response is limited to the specific representations, attachments, and citations offered by them in their briefing of that motion. The Court has not endeavored to ascertain whether there is uncited-but-relevant evidentiary material elsewhere in the extensive docket that would support the parties' representations.

[9]     Mr. Hession testified that, despite assuming the office of President in January 2006, he did not receive control over AFRA's websites, and that Mr. Henderson retained such control. Mr. Henderson appears to dispute that he retained any control over AFRA's internet presence after January 2006 (although there is at least one exhibit in the record that indicates that Mr. Henderson acted at Ms. Shell's request to remove a posting from an AFRA website in September

individuals, and a "Central Communications group" (sometimes referred to as "CenCom"), whose membership possibly overlapped (or duplicated) AFRA's board.  AFRA's websites included both strictly informational (*i.e.* read-only) websites, as well as various message boards, on which AFRA members could post messages and information and respond to messages and information posted by others.[10]  Mr. Henderson's interrogatory responses, submitted as an exhibit to Ms. Shell's responses, indicate that he created nearly all of the websites that fell within AFRA's umbrella, and did so mostly within the years 2003 and 2004.

The extent of Ms. Shell's involvement with AFRA is somewhat murky.  Mr. Henderson's motion refers to Ms. Shell as one of a number of "co-founders" of AFRA in or about 2002, although he points to no specific evidentiary material supporting this contention, and Ms. Shell's response does not address this assertion in any way.  It appears to be undisputed that Ms. Shell was a member of AFRA and participated in online discussions with other AFRA members and guests, at least through 2004.  At or about that point in time, various disagreements appear to have arisen between Ms. Shell and other AFRA members, with mutual recriminations of "sabotage," usupation of "trade secrets," and various personal insults being exchanged on the message boards.  It appears that Ms. Shell severed her association with AFRA at or about this time, as Mr. Henderson's interrogatory responses indicate that, by 2005, he had imposed a rule that "I wish to see absolutely nothing said or discussed on any of the AFRA groups about Suzanne Shell . . ." and that he would "nuke" (*i.e.* delete) any messages of that nature.

---

2006).  Because the Court must, for purposes of summary judgment, resolve all disputes of fact in the light most favorable to the non-movant (Ms. Shell), the Court will assume for purposes of this ruling that Mr. Henderson retained control over AFRA's websites after January 2006.

[10]     All of the message boards were created within yahoo.com's "groups" feature.  The parties frequently refer to the AFRA message boards as "yahoo groups" or similar.

As discussed in more detail below, Ms. Shell contends that she regained access to AFRA's websites in April 2006, and discovered that AFRA members were distributing her copyrighted works on its message boards.  This action followed.

### 3. Direct copyright infringement

Ms. Shell asserts a claim of direct copyright infringement and a claim that Mr. Henderson is secondarily liable for the copyright infringements of others, based on either a contributory infringement or vicarious infringement throry.  To establish her claim of <u>direct</u> copyright infringement against Ms. Henderson, Ms. Shell must show: (i) that she held a valid copyright in a particular work; (ii) that Mr. Henderson copied (and subsequently distributed) some protectable constituent element(s) of that work.  *Enterprise Mgt. Ltd. v. Warrick*, ___ F.3d ___, 2013 WL 2167657 (10th Cir. May 21, 2013), *citing LaResolana Architects, PA v. Reno, Inc.*, 555 F.3d 1171, 1177-78 (10th Cir. 2009).  It does not appear that Mr. Henderson disputes that Ms. Shell has a valid copyright in the works discussed herein, and thus, the sole question presented is whether Ms. Shell can demonstrate that Mr. Henderson personally copied and distributed protectable elements of her copyrighted work.

In assessing that question, the Court is guided primarily by Ms. Shell's own Supplemental Statement **(# 872)**, filed in response to the Court's instruction that she specifically identify the works she claims the Defendants infringed.  To the extent necessary, the Court treats that Supplemental Statement as having been subscribed to by Ms. Shell under the penalty of perjury, and thus treats it as an affidavit pursuant to 28 U.S.C. § 1746.  Having reviewed that Statement, the Court notes that most of Ms. Shell's allegations against Mr. Henderson derive from Mr. Henderson's status as a moderator of various internet message boards in which <u>others</u> posted Ms. Shell's copyrighted works, and that Mr. Henderson "did nothing to prevent, correct

or disavow copyright infringement that happened on" these message boards.  Claims that an individual failed to take action to halt another's copyright infringement are cognizable only as contributory or vicarious infringement claims; a claim of direct copyright infringement may be brought only against the person who specifically makes and publishes the infringing material. *See generally Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) ("[t]he Copyright Act does not expressly render anyone liable for infringement committed by another").  Thus, for purposes of Ms. Shell's <u>direct</u> infringement claims, the Court examines only those instances in her Statement in which she alleges that Mr. Henderson himself published the infringing work.

The Statement lists the following instances in which Mr. Henderson allegedly directly infringed Ms. Shell's copyrighted works:

1.  "Mr. Henderson published my copyrighted *4th Amendment Letter/Letter to School* and *Letter to Attorney (or Lawyer)* on the AFRA web site."  Ms. Shell's statement indicates that she discovered this publication by Mr. Henderson on November 13, 2005.  Ms. Shell states that when she discovered this publication by Mr. Henderson, she requested that he remove it from the AFRA website, and he complied.[11]  Ms. Shell's statement asserts that she registered a copyright in these materials on December 2, 2002 (*4th Amendment Letter/Letter to School*) or March 15, 2004 (*Letter to Attorney*).

---

[11]     Ms. Shell contends that he "continued to allow this infringing content to be copied using the AFRA-branded resources that he owed/operated."  Because this statement is written in the passive voice, the Court construes Ms. Shell to be contending that Mr. Henderson continued to contributorily or vicariously infringe her copyrights in these works, but did not himself directly re-publish his own infringing work (except as discussed herein) after he removed it at Ms. Shell's request.

2.  "[Mr.] Henderson again impermissibly published my *Letter to Attorney* on the AFRA web site on or about May 9, 2006.  I discovered it on September 24, 2006."  She contends that that publication remains viewable on the internet "in dozens of locations."

3.  Mr. Henderson "copied verbatim and in its entirety and disseminated" Ms. Shell's *Letter to School* on September 13, 2004.  The publication was made to all members of an internet message board known as AFRA_CenCom.  Ms. Shell states that she discovered Mr. Henderson's publication of that document on May 19, 2006.

4.  Mr. Henderson published *Letter to School* on his Oregon Family Rights website at some unspecified date prior to October 7, 2006.  Ms. Shell learned of the publication on October 7, 2006.  She requested that Mr. Henderson remove the infringing publication and he did.[12]

a.  Timeliness

The Court first addresses Mr. Henderson's contention that claims of direct copyright infringement based on these events are untimely.  Claims of copyright infringement are subject to a three-year statute of limitations.  17 U.S.C. § 507(b).  The claim accrues, and the statute of limitations begins running, when "the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis of the claim."  *William A. Graham Co. v. Haughey*, 568 F.3d 425, 433 (3d Cir. 2009).  As noted above, Ms. Shell commenced this action on February 13, 2009, and thus, claims arising from any alleged direct infringement by Mr.

---

[12]     Ms. Shell's statement asserts that in 2007, Lisa Smith republished Ms. Shell's *4th Amendment Letter* to a message board, "giv[ing] credit for the letter to" Mr. Henderson's Oregon Family Rights website.  However, Ms. Shell's statement does not assert that Ms. Shell herself verified that the *4th Amendment Letter* had been published by Mr. Henderson on the Oregon Family Rights website, and thus, Ms. Shell's allegation in this respect is derived solely from Ms. Smith's hearsay statement "giving credit for the letter to" Mr. Henderson.  Ms. Shell has not come forward with testimony from Ms. Smith attesting that the *4th Amendment Letter* had been published to the Oregon Family Rights website (much less that it had been published by Mr. Henderson himself), and thus, the Court does not consider this assertion further.

Henderson that she either knew of or reasonably should have known of prior to February 13, 2006 would be untimely.

Ms. Shell's direct infringement claims are set forth above in enumerated paragraph 1, which contends that she discovered certain infringing acts by Mr. Henderson in 2005.[13] However, the remaining acts of alleged direct infringement by Mr. Henderson either occurred after February 2006, or were discovered by Ms. Shell after that date. Thus, on the surface, those claims would appear to be timely.

Mr. Henderson's motion, liberally construed, appears to contend that Ms. Shell should have been aware of the publication of her copyrighted works on the AFRA web sites because "files sent to [him] by various AFRA members were already aggregated in the AFRA Bin[14] in July 2002," and that Ms. Shell "certainly knew about it." Thus, the Court understands Mr. Henderson to be arguing that Ms. Shell was aware of the AFRA websites publishing her copyrighted works early as 2002, thus making her claims here untimely. The sole evidence cited by Mr. Henderson in support of this assertion is Exhibit 2 to Docket # 870 (a motion to clarify previously filed by Mr. Henderson). That exhibit appears to be a printout of the directory

---

[13]     Ms. Shell's statement argues that the statute of limitations on her copyright infringement claims should be tolled from November 12, 2008 to December 31, 2008, during which time she was litigating those claims against the Defendants in state court in California. Without considering the question of whether the pendency of that action actually tolled the statute of limitations – Ms. Shell cites to no authority for the proposition that federal statutes of limitation are tolled by pending state actions -- the Court notes that Ms. Shell commenced that action almost exactly three years from the date (November 13, 2005) she claims to have discovered Mr. Henderson's infringing acts as set forth in enumerated paragraph 1 above. Even if the California action tolled her statute of limitations during its pendency, the statute of limitations had a single day remaining when it resumed running on December 31, 2008, when Ms. Shell dismissed that action. Thus, even if temporarily tolled, the statute of limitations on this claim expired several weeks before Ms. Shell commenced the instant suit in February 2009.

[14]     The "AFRA Bin" appears to refer to a directory of files and documents that could be accessed by AFRA members via the AFRA websites.

structure of a folder entitled "Forms," as found on the AFRA website www.family

rightsassociation.com" on or about August 20, 2002.[15]  Among the directory listings (each of

which bear a "last modified" date of July 2002), are files named, for example,

"sample_affidavit.txt," "motion_for_more_frequent_and_meaninf...," and

"to_lawyer_instruction_work_to_be_done.. ."  It would thus appear that Mr. Henderson's

contention is that Ms. Shell was aware that the two copyrighted works he is alleged to have

directly infringed, *4th Amendment Letter/Letter to School* and *Letter to Attorney (or Lawyer)*,

were published to the AFRA website (presumably by someone other than Ms. Shell) as early as

2002, thus making Ms. Shell's direct infringement claim untimely.

      The Court need not engage in a belabored discussion of such a contention.  Among the

numerous evidentiary deficiencies of such an argument, as Mr. Henderson has not come forward

with evidence to establish that any of the files listed on the exhibit are, indeed, *4th Amendment

Letter/Letter to School* or *Letter to Attorney (or Lawyer)*.  Even assuming that the Court could

rely on the file names as being indicative of their contents, none of the file names shown

correlate even remotely to a document entitled *4th Amendment Letter/Letter to School,* and

although there are two files that appear to be letters directed to attorneys

("to_lawyer_instruction_work_to_be_done.." and "for_attorney_of_falsely_accused_paren.."), it

would require sheer speculation by this Court to conclude that one of those files is necessarily

the same as Ms. Shell's copyrighted *Letter to Attorney (or Lawyer)*.  Without a more complete

---

[15]     The printout is from a website called the "Internet Archive Wayback Machine."  Its home page, www.archive.org, describes it as "a service that allows people to visit archived versions of Web sites."  Mr. Henderson does not supply any affidavit or testimony authenticating this document (nor otherwise grapple with certain evidentiary obstacles, such as the hearsay rule, that arise from evidence of this type), but for purposes of this ruling, the Court will assume that it is a true and accurate copy of what the Internet Archive reports when queried for the website and date in question.

showing that copyrighted works in question were indeed available on the AFRA's websites as early as 2002 and that Ms. Shell was aware of that fact, the Court cannot grant summary judgment on Ms. Shell's direct infringement claims to Mr. Henderson on statute of limitations grounds.

b. <u>Authorization</u>

Mr. Henderson also argues that Ms. Shell gave express permission to AFRA and its members to make use of her materials.  In support of this contention, he points to Exhibit 2 to Docket # 887 (Mr. Henderson's response to Ms. Shell's supplemental statement).  That exhibit is an undated portion of an unidentified webpage (possibly the website of the "American Family Advocacy Center," which other evidence in the record indicates is Ms. Shell's personal website), consisting of a variety of legal disclaimers and notices.  As relevant here, the notices include the following statements:

• "All material on these pages is copyright 1996-2002 Suzanne Shell reproduction without written permission is prohibited."

• "Copyright notice- copyright 1996-2004 Suzanne Shell and individual contributors where appropriate.  The content of this website is intended to generate income, it is not free if you intend to print or distribute anything electronically fixed herein."

• "Reproduction and distribution prohibited without permission.  This website is intended to be viewed on a computer only.  Permission to reproduce this website, by any method including but not limited to electronically or hard copy, may be purchased for $5,000 (five thousand dollars) per printed page per copy, in advance of printing."

• "Members of American Family Rights Association (AFRA) only may copy and distribute website material for education and training purposes without fee, provided the entire

copyright notice is included.  Parents seeking assistance with their own cases may freely use documents as models for their own cases."

In light of the final notice, Mr. Henderson's argument that he was granted license by Ms. Shell to reproduce her copyrighted works on AFRA's website might have some merit, but the evidentiary record at this stage is insufficient to permit the Court to reach that conclusion.  In order for Mr. Henderson's argument based on that final notice to prevail, Mr. Henderson must demonstrate: (i) that the works he is alleged to have infringed, *4th Amendment Letter/Letter to School* and *Letter to Attorney (or Lawyer),* were "website material" – that is, material found on the American Family Advocacy Center website at the time; (ii) that Mr. Henderson, as an AFRA member, copied and distributed the works "for education and training purposes"; (iii) that Mr. Henderson's copying and distribution of the works included "the entire copyright notice"; and (iv) that the notice on the website was in effect at the time Mr. Henderson copied and distributed the material.  Neither party has supplied the Court with evidentiary material that addresses each of these additional points; indeed, as best the Court can determine, the record does not even include Ms. Shell's works or Mr. Henderson's alleged copies of them.  Accordingly, the Court cannot conclude that Mr. Henderson is entitled to summary judgment on this argument. Assuming he can produce such evidence at the time of trial, he may move for judgment as a matter of law at the appropriate time pursuant to Fed. R. Civ. P. 50.

c.  Failure to register

Finally, Mr. Henderson argues that his acts of infringement occurred prior to Ms. Shell's registration of copyright in the works in question.  As the recitation above notes, this is contrary to Ms. Shell's representations as to the dates that those works were registered, and thus, the Court cannot grant summary judgment to Mr. Henderson on that point.  Moreover, as discussed

above with regard to Ms. Swallow, the fact that a work was not registered for copyright purposes affects the types of damages that Ms. Shell might recover, but does not preclude her from bringing an infringement claim.

Accordingly, the Court finds that Mr. Henderson is entitled to summary judgment on Ms. Shell's direct infringement claim to the extent it contends he infringed by publishing her copyrighted works to the AFRA website on or before November 13, 2005 (enumerated paragraph 1, above), but denied as to all other alleged acts of direct infringement.

### 4. Secondary liability for infringement

Ms. Shell also seeks to hold Mr. Henderson secondarily liable for acts of infringement committed by others.  Such secondary liability can arise from two distinct theories: contributory infringement, and vicarious infringement.

### a. Governing law

Both doctrines of secondary copyright infringement are set forth in the *Grokster* case.  It explains that contributory copyright infringement occurs when one "intentionally induc[es] or encourag[es] direct infringement" by another.   545 U.S. at 930.  A showing of contributory infringement requires a demonstration of "an affirmative intent" to infringe, such as evidence of "active steps taken to encourage direct infringement" by third parties. *Id.* at 936.  On the other hand, "mere knowledge of infringing potential" or of others' engaging in infringement would not be sufficient to subject a person to liability for contributory infringement; what is essential is "purposeful, culpable expression and conduct" by the accused. *Id.* at 937.  Thus, to show contributory infringement by Mr. Henderson, Ms. Shell must show: (i) Mr. Henderson's distribution of a product or service; (ii) acts of infringement by third parties using that product or service; (iii) Mr. Henderson having an objective of promoting the use of the product or service to

infringe copyrights; and (iv) a causal connection between Mr. Henderson's objective and the acts of infringement committed by the third parties. *Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020, 1032 (9th Cir. 2013).

Vicarious infringement occurs by a defendant "profiting from direct infringement while declining to exercise a right to stop or limit it." *Grokster*, 545 U.S. at 930. It is an outgrowth of the common-law concept of *respondeat superior*, and arises where a defendant has both "the right and ability to supervise the infringing activity" and "a direct financial interest in the activity." *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1071 (9th Cir. 2013). In this sense, contributory infringement focuses on a defendant's own affirmative actions to facilitate infringement, whereas vicarious liability is based on the defendant's failure to intercede to halt a third party's infringement; one might reasonably characterize the two claims as addressing active encouragement of infringement (contributory) versus passive encouragement (vicarious). *See e.g. Luvdarts*, 710 F.3d at 1071, *citing Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1175 (9th Cir. 2007). Thus, to show vicarious liability, Ms. Shell must show: (i) that a third party engaged in acts of infringement; (ii) that Mr. Henderson had the capacity of supervise the infringing activity (or the "right and ability to control" that activity); (iii) that he failed to exercise his authority to halt the infringement; and (iv) that he had a direct financial interest in the infringing activity. *Id.*; *Viacom Intern., Inc. v. YouTube, Inc.*, 676 F.3d 19, 38 (2d Cir. 2012).

### b. Ms. Shell's contentions

With these general principles in mind, the Court turns to Ms. Shell's allegations in her Supplemental Statement. In general, she alleges that "[Mr.] Henderson was owner and moderator of [various websites] with full authority to prevent or correct copyright infringement [and he] did nothing to prevent, remove, or disavow copyright infringement." She cites five

instances in which third parties published her copyrighted work to the AFRA_HelpLine message board between 2004 and 2007,[16] but does not indicate any affirmative acts by Mr. Henderson encouraging or inducing such infringement by third parties, relying merely on her assertion that his passive failure to control such activity subjects him to liability.  She also lists numerous instances in which third parties infringed her copyrighted works on other AFRA message boards, and again, contends that Mr. Henderson, "as undisputed owner and moderator" of these boards, "did nothing to prevent, correct, or disavow" such conduct.  Two additional allegations by Ms. Shell in this regard warrant comment.  First, she contends that Mr. Henderson "had always freely given permission for anyone to copy the content he published on" the various websites he managed.  Second, she alleges that an AFRA board member by the name of "Keifer" published Ms. Shell's copyrighted works on certain AFRA message boards, and that "Mr. Henderson facilitated Mr. Keifer's infringement even after being advised of it," but she does not elaborate.

### c. Contributory infringement

The Court cannot say that, on their face, any of Ms. Shell's allegations against Mr. Henderson are sufficient to establish the third element of a claim of contributory copyright infringement – that Mr. Henderson acted with an objective of promoting or inducing copyright infringement.  With the exception of those instances, discussed above, in which Mr. Henderson himself published infringing content, Ms. Shell makes no allegations of circumstances in which Mr. Henderson affirmatively encouraged, instructed, or induced others to infringe Ms. Shell's copyrights.  In cases such as *Grokster* and *Fung*, where courts have upheld findings of contributory infringement, the defendants have affirmatively promoted their services' suitability

---

[16]    She alleges she discovered these postings after being granted access to the AFRA_Helpline message board on April 8, 2006, rendering any secondary infringement claims against Mr. Henderson timely for the reasons set forth above.

for infringing copyrights or affirmatively requested that users obtain and upload specific copyrighted works.  Ms. Shell's allegations against Mr. Henderson assert no such affirmative acts on his part.

However, Ms. Shell's response to Mr. Henderson's motion includes several portions of the deposition testimony of Mr. Hession, in which Mr. Hession describes statements by Mr. Henderson about copyright concerns.  Much of Mr. Hession's testimony is largely irrelevant, as Ms. Shell asks him to read certain messages that passed between Mr. Henderson and other AFRA members and then asks Mr. Hession what Mr. Hession makes of them.  Mr. Hession's opinions of others' motivations or purposes is immaterial.  However, Mr. Hession's deposition testimony does provide a (somewhat second-hand) recitation of the contents of Mr. Henderson's messages themselves.  For example, Ms. Shell inquires about a June 23, 2004 e-mail message from Mr. Henderson to the AFRA board that appears to be a response to messages from other AFRA board members discussing copyright concerns.[17]  Mr. Henderson's message states, in part, "You do not put a file on the internet and really expect copyright protection.  Especially in the files area of a Yahoo group.  It is pretty well understood that those files are available for the group's use."

Taken in the light most favorable to Ms. Shell, Mr. Henderson's statement could be understood to encourage other AFRA board members to obtain copyrighted material and post it in the files area of the AFRA websites for AFRA members to use.  Mr. Henderson's comment that "you do not . . . really expect copyright protection" could be understood to indicate that Mr. Henderson was aware that certain materials being supplied to AFRA were copyrighted, but that

---

[17]     Mr. Henderson's message appears to be a response to a message from AFRA board member Sheryl McGrath to the board, in which Ms. McGrath asserts that "Files are for all to use, 'fair use' as long as you're a member of the AFRA CenCom group."

Mr. Henderson refused to recognize such protection.  In this sense, his comments might be seen as similar to those of the defendant in *Fung,* who solicited users to upload copyrighted materials to his website despite being aware that those materials infringed copyrights.  Accordingly, the Court finds that Ms. Shell has come forward with sufficient evidence to give rise to a cognizable claim of contributory copyright infringement against Mr. Henderson.

Mr. Henderson's motion primarily contests this claim on the grounds that Ms. Shell cannot show that any third party engaged in direct copyright infringement, such that Mr. Henderson could thus be held secondarily liable for it.  It is not clear whether this is a factual or legal argument by Mr. Henderson.  To the extent Mr. Henderson is asserting that, as a matter of law, no third-party infringement occurred, the Court would understand him to be asserting the same arguments it has previously addressed (and rejected) with regard to Ms. Shell's claim of direct infringement—*e.g.* that Ms. Shell licensed her content to AFRA.  To the extent Mr. Henderson is contending that, as a factual matter, none of the alleged instances of third-party infringement actually infringed Ms. Shell's work, both Mr. Henderson and Ms. Shell have failed to carry their respective burdens, as neither one has supplied the Court with any evidence that addresses whether or not any of the instances of alleged third-party infringement recited in Ms. Shell's Supplemental Statement are indeed unlawful.  Neither Ms. Shell nor Mr. Henderson, for example, address whether AFRA member Linda Weston's message board posting on June 5, 2004 does or does not infringe upon Ms. Shell's copyrighted *Letter to Attorney*, or whether Susan Jackson's March 9, 2005 posting on AFRA_HelpLine infringed that same work.  Because Rule 56(c)((1)(A) places the initial burden of demonstrating the relevant undisputed facts on the movant – here, Mr. Henderson – he absence of any factual development of the question of third-party infringement requires that the Court deny Mr. Henderson's motion and permit the

contributory infringement claim to proceed to trial.  If, at the time of trial, Ms. Shell fails to demonstrate any third-party infringement, Mr. Henderson may seek judgment as a matter of law on her claims for secondary liability pursuant to Fed. R. Civ. P. 50.

Accordingly, Mr. Henderson's motion for summary judgment as to Ms. Shell's secondary liability claim against him, to the extent premised on a theory of contributory infringement, is denied.

### d.  Vicarious infringement

The Court then turns to whether Ms. Shell's contentions give rise to a cognizable claim of vicarious infringement.

Mr. Henderson's motion does not address a potential claim of vicarious infringement with any degree of specificity.  At best, it appears that he relies on the same argument addressed above – that Ms. Shell cannot show any third-party infringement for which he can be held vicariously liable.  For the reasons set forth above, the Court rejects this argumetnt.

Assuming that Ms. Shell can demonstrate that members of the AFRA websites posted infringing material, it appears to be undisputed that Mr. Henderson possessed the authority to moderate and delete messages and content on AFRA websites, at least until January 2006, and, taking the evidence in the light most favorable to Ms. Shell, for some period of time beyond that. Mr. Henderson's own discovery responses indicate that he "nuked" messages and "removed" materials from AFRA websites as Ms. Shell's request as late as September 2006.  Thus, it appears he had "both the legal right to stop or limit the infringing conduct, as well as the practical ability to do so." *Range Road Music, Inc. v. East Coast Foods, Inc.*, 668 F.3d 1148, 1155 (9th Cir. 2012).

It also appears to be undisputed that Mr. Henderson did not unilaterally exercise his power to remove the material Ms. Shell alleges was infringing; in other words, it does not appear that Mr. Henderson affirmatively investigated whether material being posted by AFRA's users was potentially infringing.  On the other hand, there is no particular evidence in the record to indicate that Mr. Henderson ever failed to act on a request by Ms. Shell to remove infringing material posted by a third party.  Ms. Shell's Supplemental Statement alleges only a single instance in which Mr. Henderson allegedly failed to honor her request to remove material – the material posted by Mr. Keifer in March 2006 – but, as noted above, Ms. Shell's allegations on this point are entirely conclusory.  To the contrary, Mr. Henderson points to a September 2006 posting by Ms. Shell on a message board entitled "FamilyRightsAdvocacyIMPROVEMENT Project."  In that post, Ms. Shell reports that she made a request that Mr. Henderson remove an infringing file from the website familyrightsassociation.com, and she quotes Mr. Henderson's response: "OK. Done.  Please examine the several other similar files in the AFRA Bin to see if any more are yours.  I will happily remove them."  Ms. Shell goes on to praise Mr. Henderson's response, stating "I am here to publicly thank Leonard for his prompt and appropriate response to my (oh what the hell) demand. This is the absolutely perfectly perfect model of how to respond to an intellectual property cease and desist demand.  Leonard, for all my complaints, has ALWAYS responded appropriately to intellectual property demands.  I must confess to respecting that from him."

Ms. Shell's summary judgment response appears to dispute Mr. Henderson's contention that he always removed material at her request.  She posed an interrogatory to him asking that he "describe all instances where he was contacted by anyone alleging infringing content on his web sites."  Mr. Henderson's response recites a single instance from Ms. Shell – the September 2006

request discussed above (as well as certain requests from non-parties to this action that are not relevant here).  Ms. Shell's summary judgment response contends that "This testimony is false. His own documents show that I contacted him multiple times about infringing content on his web sites and groups between 2004 and 2006."  However, Ms. Shell does not go on to allege that, even if Mr. Henderson's interrogatory response failed to recite other instances between 2004 and 2006 when she contacted him and requested that he remove infringing posts, Mr. Henderson refused to do so.  Indeed, her posting in September 2006, in which she states "[Mr. Henderson], for all my complaints, has ALWAYS responded appropriately to intellectual property demands" would appear to refute such a contention.  Accordingly, the Court finds that, based on the record presented herein, there is no genuine dispute of fact as to whether Mr. Henderson promptly removed all infringing materials that were brought to his attention by Ms. Shell.

It is not entirely clear whether a party's compliance with a copyright holder's request to remove infringing material is sufficient to defeat a claim of vicarious infringement.  Typically, parties seek to avoid litigation and thus, the removal of the offending material is usually sufficient to prevent a lawsuit from following.  Thus, the Court's own research produced no cases in which courts have addressed whether a party can be liable for vicarious infringement despite responding to the copyright holder's request that infringing material be removed.  The Court notes, however, that 17 U.S.C. 512(c)(1)(A)(iii), provides that a "service provider shall not be liable for . . . infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider if the service provider . . . upon obtaining [ ] knowledge or awareness [of infringing material], acts expeditiously to remove, or disable access to, the material."  Such language strongly

suggests that, so long as Mr. Henderson complied with Ms. Shell's requests that infringing material posted by third parties be removed, he cannot be held liable for vicarious infringement.[18]

Accordingly, the Court finds that Mr. Henderson is entitled to summary judgment on Ms. Shell's claim of secondary liability for copyright infringement, to the extent that claim is premised on a theory of vicarious infringement.

5. Unfair trade practices

Finally, the Court turns to Mr. Henderson's request for summary judgment on Ms. Shell's claim of unfair trade practices. As construed by the Court's September 28, 2012 Order, this claim arises under the Colorado Consumer Protection Act ("CCPA"), C.R.S. § 6-1-101 *et seq.*

The CCPA prohibits "unfair or deceptive trade practices," such as "false representations as to the source . . . of goods [or] services," or "disparaging the goods [or] services . . . of another by false and misleading representations of fact." C.R.S. § 6-1-105(1)(b), (h). To establish a CCPA claim, Ms. Shell must show: (i) that Mr. Henderson engaged in a deceptive practice as defined by the statute; (ii) that the challenged practice occurred in the course of his business or vocation; (iii) that the practice significantly impacts the public as consumers of Ms. Shell's goods or services; (iv) that Ms. Shell suffered an injury to a protected interest; and (v) that injury

---

[18]     Both the claim of vicarious infringement, and the safe harbor provision of 17 U.S.C. § 512, also examine the question of whether the vicarious infringer derived a financial benefit as a result of the infringing conduct. *See* 17 U.S.C. § 512(c)(1)(B) (denying the safe harbor if the service provider receives "a financial benefit directly attributable to the infringing activity"). Neither Mr. Henderson nor Ms. Shell directly address this matter, but the exhibits attached to Ms. Shell's response briefly touch on it. Ms. Shell submits a portion of Mr. Hession's deposition in which he states that "by the time I left [AFRA, in or about January 2006], Mr. Henderson was starting to talk about the necessity to get money because these things were going to cost a lot of money, so he had begun to think through how we were going to raise and spend money." This suggests that, at least until 2006, Mr. Henderson was not deriving any financial benefit from AFRA, much less a financial benefit that could be traced directly to AFRA's publication of Ms. Shell's copyrighted works.

was caused by Mr. Henderson's deceptive practice. *Garcia v. Medved Chevrolet, Inc.*, 263 P.3d 92, 98 (Colo. 2011).

Mr. Henderson's motion does not offer any particular analysis of Ms. Shell's CCPA claim. He merely contends that Ms. Shell has "made no specific claim" as to each of the relevant elements. This is insufficient to carry his burden, as a movant, to "show that there is n genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). A single assertion that the other side cannot prove its claim, unaccompanied by citations to relevant evidence, does not "show" anything. Because Mr. Henderson did not carry his initial burden to come forward with evidence establishing the absence of any cognizable CCPA claim by Ms. Shell, the Court need not proceed to evaluate the evidence Ms. Shell has offered in response.[19]

Mr. Henderson makes one additional argument, contending that Ms. Shell's CCPA claim is untimely. Claims under the CCPA are subject to a three-year statute of limitations, with the

---

[19]     The Court has, however, reviewed this evidence and offers several observations. Ms. Shell appears to take particular umbrage at insulting statements that Mr. Henderson made about her in messages posted on AFRA's websites, calling her a "loose cannon" and a "psycho," describing her as causing a "whirlwind of trouble" or a "slime war." (She also points to Mr. Hession's testimony that unnamed individuals on the AFRA websites called her "a bitch," "angry," "impossible," and "a sociopath," but it is unclear whether Ms. Shell contends that Mr. Henderson himself made such statements.) The Court has grave doubts as to whether such insults constitute "disparaging [Ms. Shell's] goods or services . . . by false and misleading representations of fact" C.R.S. § 6-1-105(1)(h). Such name-calling, while perhaps immature, does not amount to representations of <u>fact</u>; a statement that a person is a "loose cannon" or a "psycho," a "whirlwind of trouble," or even a "sociopath" (when offered in a non-clinical sense) is simply a statement of the speaker's <u>opinion</u>. At least in the instant record as presented by Ms. Shell, the Court sees no evidence of instances in which Mr. Henderson made <u>factual</u> misrepresentations about the nature or quality of Ms. Shell's services, and thus, the Court has some doubt that a CCPA claim premised on C.R.S. § 6-1-105(1)(h) can be established by Ms. Shell. There is some evidence, however, that Mr. Henderson did intentionally appropriate and pass off Ms. Shell's work as that of AFRA, suggesting that she can establish at least some of the elements of a CCPA claim premised on C.R.S. § 6-1-105(1)(b). Whether Ms. Shell can ultimately show that she suffered an injury and that Mr. Henderson's conduct was the specific cause of that injury is a matter that remains to be addressed by the parties.

claim accuring upon the plaintiff's actual or constructive discovery of the defendant's deceptive conduct.  C.R.S. § 6-1-115; *Stiff v. BilDen Homes, Inc.*, 88 P.3d 639, 642 (Colo. App. 2003).  As with Ms. Shell's copyright claims, Ms. Shell claims that she did not discover Mr. Henderson's acts of passing of her work as that of AFRA until April 2006, and thus, her commencement of this action in February 2009 would render those CCPA claims timely.  Mr. Henderson makes a perfunctory argument that "these practices began in August 2000," but does not specify what he means (much less what Ms. Shell means) by "these practices," and, in any event, he points to no evidence in the record concerning any "practices" beginning in 2000.  Thus, the Court denies his request for summary judgment on the CCPA claims on timelines grounds.

Accordingly, Mr. Henderson's motion for summary judgment is granted in part, insofar as the Court finds that Mr. Henderson is entitled to summary judgment on any secondary copyright infringement claim by Ms. Shell against him that is premised on vicarious liability, and denied in part in all other respects.

Because the remaining claims against Mr. Henderson are proceeding to trial, the Court will conduct a Pretrial Conference at **1:30 PM** on **July 25, 2013**, in anticipation of a jury trial commencing in early September 2013.  Given the nature of this case, including the parties' *pro se* status, the Court relieves the parties of the existing requirements for submission of a proposed Pre-Trial Order, and instead directs as follows.  On or before **July 1, 2013**, Ms. Shell shall file: (i) a narrative statement setting forth the full text of Mr. Henderson's May 9, 2006 and September 13, 2004 postings of what Ms. Shell contends were her copyrighted works, as well as the full text of her *Letter to School* as posted on the Oregon Family Rights website at some unspecified date prior to October 7, 2006; (ii) the full text of the copyrighted *Letter to Attorney* and *Letter to School*, along with the appropriate certificate(s) of registration of copyright on

those works; and (iii) the full text of any postings of her copyrighted works for which she seeks to hold Mr. Henderson liable for contributory infringement, along with her relevant copyrighted work and certificate of registration for that work.  Mr. Henderson shall file a statement setting forth any affirmative defenses he intends to raise, and providing the full text of any message board postings or e-mails he intends to rely upon to establish such defenses. Moreover, both parties shall each file a list of the witnesses that they intend to call in their case, along with a brief statement of the facts they believe any listed third-party witness would testify to; a list of all documentary exhibits that they intend to present at trial, along with a copy of each such exhibit; and a copy of all proposed jury instructions that they request that the Court give.

### E.  Mr. Blair's motion

Mr. Blair has filed a "Motion to Dismiss and/or For Summary Judgment" (**# 993**). Because the motion is primarily directed at the sufficiency of Ms. Shell's pleading against Mr. Blair, the Court will construe it as one pursuant to Fed. R. Civ. P. 12(b)(6), and to the extent the motion contains assertions of facts beyond those in Ms. Shell's Complaint, the Court disregards them.

The Court has previously addressed the sufficiency of Ms. Shell's pleading in the Complaint, and to the extent necessary, the Court deems its recitation of the applicable standard and its analysis of Ms. Shell's Complaint incorporated herein.  It is sufficient to note here that the Complaint contains no allegations that specifically refer to Mr. Blair.  The only times that Mr. Blair is mentioned in the substantive body of Ms. Shell's Complaint is as part of a lengthy, boilerplate assertion that he, along with more than two dozen other individuals and entities, engaged in some vague and conclusorily-described conduct.  As one example:

> American Family Rights Association (AFRA), Leonard
> Henderson, William O. Tower, Ann Tower, Susan Adams Jackson

> aka Susan Wolverton, Justice for Families (JFF), Keith Fredericks,
> [18 additional names follow], **Randall Blair**, Kathy Tilly, Ringo
> Kamens violated section 192(d) in that they knowingly furthered,
> advanced, or participated in Keifer's 1962 violation . . . .

*Docket* # 1, ¶ 197 (emphasis added).  All of the mentions of Mr. Blair in the Complaint follow

the same pattern; nowhere does Ms. Shell ever identify even a single specific act that Mr. Blair

in particular is alleged to have committed.

As the Court's prior orders have explained, a plaintiff must plead more than "labels and

conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertions

devoid of further factual enhancement" in order to survive dismissal.  *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009).  Ms. Shell's allegations against Mr. Blair are precisely the sort of "naked

assertions devoid of further factual enhancement" described in *Iqbal*.  In the argot of *Iqbal*, Ms.

Shell's allegations against Mr. Blair are nothing more than "an unadorned, the-defendant-

unlawfully-harmed-me accusation."  *Id.*  This is insufficient to state a claim under Rule 12.

Ms. Shell's response to Mr. Blair's motion consists largely of boilerplate legal arguments

that Ms. Shell has tendered in other responses, along with a wealth of new factual averments

about Mr. Blair, none of which even remotely resemble allegations found in the Complaint itself.

She contends that "I am going to be filing a motion to amend my complaint to add" new

allegations and claims against Mr. Blair, but, the Court notes, more than two months have passed

since Ms. Shell's response was filed and yet she has not filed any motion to amend her

Complaint.  Moreover, at this late stage of the litigation, it is extremely unlikely that the Court

would grant leave to Ms. Shell to make such amendments, as such a request to amend at this late

stage would very likely be found to be in bad faith, dilatory, and the product of undue delay.  *See*

*Foman v. Davis*, 371 U.S. 178, 182 (1962).  Ms. Shell's response offers no argument sufficient

to rebut the conclusion that her Complaint, as it presently stands, utterly fails to assert a non-conclusory claim against Mr. Blair.

Accordingly, Mr. Blair's Motion to Dismiss is granted, and all claims against Mr. Blair are dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

### F. Ms. Shell's Objections

Finally, the Court turns to several Objections that Ms. Shell has filed to rulings by the Magistrate Judge. In each instance, Ms. Shell is objecting to non-dispositive rulings, and thus, this Court's review is circumscribed by Fed. R. Civ. P. 72(a). As such, this Court will reverse the Magistrate Judge's orders only if they are "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); *Hutchinson v. Pfeil*, 105 F.3d 562, 566 (10th Cir. 1997); *Ariza v. U.S. West Communications, Inc.*, 167 F.R.D. 131, 133 (D. Colo. 1996). Such relief is appropriate if the Magistrate Judge applied the wrong law, abused her discretion or, if after viewing the record as a whole, this Court is left with a "definite and firm conviction that a mistake has been made." *Ariza,* 167 F.R.D. at 133, *citing Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458, 1464 (10th Cir.1988).

### a. September 11, 2012 Minute Order

Mr. Henderson moved **(# 817)** moved to file a document at restriction Level 2 (viewable by the filing party and the Court only) pursuant to D.C. Colo. L. Civ. R. 7.2 The Magistrate Judge had previously directed Ms. Shell to file certain materials under a Level 1 (viewable by the parties and Court, but not the public) restriction, but Ms. Shell unilaterally decided to file the materials under a Level 2 restriction, in an attempt to shield them from certain defendants. The Magistrate Judge directed **(# 801)** that the Clerk of the Court lift the Level 2 restriction on Ms.

Shell's filings, and instead place the materials under Level 1 restriction.  Ms. Shell filed a Rule 72(a) Objection (**# 808**) to that order.

In responding to that Objection, Mr. Henderson moved (**# 817**) to file his response under a Level 2 restriction, stating that "I found it impossible to write preserving the confidentiality of the [materials previously filed by Ms. Shell]."  The Magistrate Judge granted (**# 838**) Mr. Henderson's motion in a September 11, 2012 Minute Order, directing that Mr. Henderson's filing (**# 818**) remain at a Level 2 restriction, but not making any findings to support that conclusion.

Ms. Shell has Objected (**# 841**) to that Minute Order, arguing that Mr. Henderson's filing should, at a minimum, be subject to a Level 1 restriction (which would permit Ms. Shell to see it), rather than a Level 2 restriction (which would prevent her from seeing it).  Having reviewed the underlying document, the Court agrees.  Mr. Henderson's filing is related to the materials previously filed by Ms. Shell and given a Level 1 restriction by the Magistrate Judge, and this Court sees nothing in Mr. Henderson's filings that would warrant a higher restriction level.  Certainly, this Court sees nothing in the document sufficient to treat it as, effectively, an *ex parte* filing by Mr. Henderson.  Accordingly, the Court grants Ms. Shell's Objections, vacates the Magistrate Judge's September 11, 2012 Minute Order, and directs that the filing at Docket # 818 be given a Level 1, not Level 2, restriction.

b. January 25, 2013 Minute Order

Ms. Shell also objects (**# 1027**) to a January 25, 2013 Minute Order (**# 1024**) by the Magistrate Judge.  This Objection has two components.  First, Ms. Shell objects to that portion of the Minute Order that denied Ms. Shell's Forth Motion for Sanctions (**# 928**) against Ms. Swallow on the grounds that it was "duplicative of Document 918."  Docket # 918, which was

pending at the time, was also a motion for sanctions directed at Ms. Swallow.   Docket # 918 was granted in part and denied in part at a hearing on February 12, 2013 (**# 1068**).

This Court has examined both motions directed at Ms. Swallow, (**# 918 and #928**).   Both motions seek sanctions against Ms. Swallow for failing to comply with an order by the Magistrate Judge at Docket # 910, and both appear to focus on the fact that Ms. Swallow had failed to provide notarized discovery responses by a deadline set by the Court.   Thus, is appears to the Court that the motions raise issues that are primarily, if not wholly, identical.   Ms. Shell contends that the motions are directed at "different discovery responses," but any such difference is, at best minimal.   *Compare  Docket* # 918, ¶ 11 *and Docket* # 928, ¶ 4 (the latter also mentioning Ms. Shell's failure to receive a response to a discovery request relating to "her work history which the court also ordered," but which is, in all other respects, identical to the former).   To the extent that Ms. Shell's later motion raised additional matters, this Court cannot say that the Magistrate Judge's subsequent resolution of the earlier motion, after a hearing in which Ms. Shell participated and had an opportunity to refine and clarify her requests, resulted in any prejudice to her.

The second component of the January 25, 2013 Minute Order that Ms. Shell objects to is the portion of it that denied Ms. Shell's Motion to Matters As Admitted . . .," (**# 952)** directed at Mr. Henderson.   The Magistrate Judge found that her motion directed at Mr. Henderson "raised these same issues  . . . in her subsequently filed "Second Motion to Compel Henderson to Respond" (**# 1001**), which the Magistrate Judge thereafter considered and denied (**# 1068**).   In her Objections, Ms. Shell contends that the motions denied in the January 25, 2013 Minute Order were not duplicative of the motions subsequently considered by the Magistrate Judge.

As to the motions directed at Mr. Henderson, docket # 952 and docket # 1001, it appears that Ms. Shell's earlier motion addressed deficiencies in Mr. Henderson's response to Ms. Shell's <u>First</u> and <u>Fourth</u> Sets of Requests for Admission, whereas her later motion addressed her <u>Fifth</u> Set of Interrogatories and Requests for Admission.  When the Magistrate Judge ruled that the latter motion "raised the same issues" as the former, it is unclear whether the Magistrate Judge meant that they raised the same <u>legal</u> issues (*i.e.* the consequences of Mr. Henderson's failure to respond to requests for admission) or whether the Magistrate Judge meant that they raised the same <u>factual</u> issues (*i.e.* that both motions were directed at Mr. Henderson's responses or lack thereof to the same set of discovery requests).  If it was the first interpretation, the Magistrate Judge was correct; if it was the second interpretation, then it was erroneous.

Ultimately, however, the question of whether the Magistrate Judge erred has been rendered moot by subsequent developments.  The Magistrate Judge addressed docket # 1001 at a hearing on February 12, 2013, and resolved various issues.  As discussed below, Ms. Shell has filed Objections to the Magistrate Judge's Order resulting from the February 12 hearing as well, and in those Objections, complained that the issues underlying docket # 952 remained unresolved.  Simultaneously, Ms. Shell filed a Renewed Motion for Sanctions **(# 1072)** against Mr. Henderson, essentially explaining that the issues from docket # 952 remained extent.  Mr. Henderson filed a response **(# 1085)** to Ms. Shell's renewed motion, attaching responses to the requests for admission that were at issue.  That same day, the Magistrate Judge denied **(# 1084)** this renewed motion (finding that the issues raised therein "have been dealt with repeatedly by this court and have been the subject of several rulings during hearings").  Ms. Shell has not sought review of that ruling.

Accordingly, Ms. Shell's Objections to the January 25, 2013 Minute Order are overruled.

     c. <u>February 12, 2013 Minute Entry</u>

Ms. Shell objects (**# 1027**) to several rulings made by the Magistrate Judge at a lengthy hearing on February 12, 2013.  It is impractical for the Court to attempt to summarize the many issues raised by Ms. Shell; it is sufficient to note that nearly all of her objections revolve around a more generalized complaint that the Magistrate Judge has demonstrated a bias in favor of the defendants, has forgiven their untimeliness or lack of responses (in circumstances where the Magistrate Judge was not lenient with regard to Ms. Shell), fashioned arguments for them, has yelled at and demeaned Ms. Shell, etc.

Such perceptions are not unusual, particularly among *pro se* litigants.[20] There is little that this Court can say that would disabuse parties of the notion that judges are biased against them or that the judge shows favoritism to their opponents, other than to assure them that judges constantly examine and re-examine their own feelings and actions in an attempt to prevent any such bias or favoritism from arising, much less influencing any ruling.  Decisions involving discovery disputes often require the court to weigh competing versions of the facts, exercise considerable discretion in ascertaining relevance, and assess a party's good or bad faith, among other things.[21]  To a litigant, these determinations can often seem largely subjective, and that

---

[20]    Just as Ms. Shell believes that the Magistrate Judge "yelled at" her and shown favoritism towards the Defendants, Ms. Swallow believes that she too "been met with derision and discrimination by this court . . . ."  *Docket* # 1094, ¶ 3.

[21]    In this sense, the Court is reminded of the advisements it gives to parties at the pretrial conference.  The Court points out that the trial process is not a perfect process.  One of its limitations is that the factfinder (either jury or judge) is limited to the evidence that is presented, and because the factfinder was not there when the pertinent events occurred, they/he/she does not experience the emotional nuances of the event. The Court frequently analogizes the  factfinder's role as similar to that  of a viewing someone else's vacation photos: to the vacationer, a photo of a beach and a palm tree evokes all sorts of additional sensory and emotional memories, including the smell of the salt air, the warmth of the sun, and the feeling of serenity that accompanied being on vacation.  To the viewer, however, who lacks the same firsthand experience, the photo

perception is often magnified when the court must accommodate *pro se* parties' unfamiliarity with (and sometimes, misunderstanding of) substantive law and procedural requirements. Just as the Court is required to hold *pro se* litigants to the same standards as represented parties when it comes to compliance with substantive and procedural obligations, the Court is also under a directive to, whenever appropriate, favor resolution of an issue on its merits rather than on the basis of "mere technicalities." *Foman*, 371 U.S. at 181-82. Taken together, these various realities may appear as bias to a party who is unhappy with a particular result.

This Court has carefully reviewed those aspects of Ms. Shell's Objections that can be assessed on the record – that is, it has reviewed the underlying motions, responses (if filed), and the Magistrate Judge's rulings. (Ms. Shell has not provided the Court with a transcript, much less a recording, of the hearing before the Magistrate Judge, making it impossible to evaluate what was actually said, much less how it was said.) Based on that review, this Court finds no clear error or an abuse of discretion in any of the Magistrate Judge's rulings at the February 12, 2013 hearing. Accordingly, Ms. Shell's Objections to those rulings are overruled.

---

is nothing more than a photo of a beach and a palm tree. In this sense, both the vacationer and the viewer have the same tangible factual record before them, but each appreciates it differently.

The same can be true of the Magistrate Judge's determination of the facts underlying a discovery dispute. The judge was not there when the dispute arose, and can only appreciate the contours of the dispute by means of the parties' representations about it. But such an appreciation of the dispute can never fully capture the parties' own feeling of frustration, miscommunication, or obstruction related to the dispute. And, much like the vacationer who feels that the viewer hasn't fully appreciated what it was like to be on the beach, the parties to a discovery dispute might very well feel that the Magistrate Judge did not fully understand the contours of the dispute. The flaw is not in the Magistrate Judge's evaluation of the situation, but instead, it is the natural outgrowth of having a neutral third party who has no emotional investment in the controversy assess the merits of the parties' positions according to legal rules that do not account for emotional components.

d. <u>March 13, 2013 Minute Order</u>

On March 13, 2013, the Magistrate Judge *sua sponte* struck (**# 1112**) certain exhibits (**#1103-1111**) that Ms. Shell had submitted in conjunction with a motion (**# 1091**) she had filed seeking sanctions against Mr. Henderson.  The Magistrate Judge found that the exhibits – "video clips, some with written commentary, of Defendant Henderson's deposition" – were "an invasion of Defendant Henderson's privacy and a purposeful attempt to cause him embarrassment,"[22] in violation of Fed. R. Civ. P. 26(c)(1).  (Because there is no mechanism by which filings in the Court's electronic docket can be "stricken," the Magistrate Judge directed that Ms. Shell's exhibits be placed under restricted access at Level 3, meaning that only the Court can access the exhibits.)  The Magistrate Judge stated that to the extent Ms. Shell wished to have the Court consider Mr. Henderson's deposition testimony, she could file the appropriate excerpts from a transcript of that deposition.

Ms. Shell has filed Objections (**# 1114,** as supplemented **# 1115**) to the Magistrate Judge's Order arguing variously: (i) that a deposition transcript had yet to be completed; (ii) that the video clips were necessary to demonstrate certain conduct by Mr. Henderson and his wife that would not be reflected in a transcript[23]; (iii) that the clips were necessary to demonstrate technical deficiencies in the video connection, audio levels, and various other matters; and (iv) more generalized complaints by Ms. Shell as to unfairness or inconsistent instructions given to

---

[22]     The Magistrate Judge did not elaborate on the nature of the "embarrassing" nature of the clips.  It appears to this Court that the Magistrate Judge's conclusion was based on the fact that Mr. Henderson wears a prominent oxygen mask and attached tubing that renders his speaking labored and difficult to understand.  The Court notes that Mr. Henderson has often made reference to his ill health in various filings.  *See e.g.* Docket # 858, #900, # 1042.

[23]     For example, Ms. Shell contends that Mr. Henderson's wife, after being told to leave the room where Mr. Henderson was sitting for the video deposition, would attempt to crawl into the room and hide behind furniture to suggest answers to Mr. Henderson.

her by the Court, as well as other collateral matters.  Ms. Shell denies that she intended to embarrass Mr. Henderson by filing the clips, and states that Mr. Henderson has remarked, on several occasions, about his health difficulties.

This Court reviewed Ms. Shell's motion and watched the video clips in question.  From that review, the Court has several observations.  First, the Court agrees, at least in the abstract, with Ms. Shell, that some of the matters her motion raised were matters – *e.g.* defects in audio or video quality, or a person surreptitiously entering the room -- that a transcript might not meaningfully convey.  That being said, the Court also notes that, in nearly every situation, there was an adequate oral record of the relevant events.  For example, on the occasions when Ms. Henderson lingered in the room and suggested answers, either Mr. Henderson, Ms. Shell, or both commented upon the matter (and on at least one occasion, Ms. Shell exchanged comments with Ms. Henderson that are recorded on the video[24]).  On another occasion, when Mr. Henderson's microphone cut out, Ms. Shell orally acknowledged being unable to hear Mr. Henderson until the matter was resolved.  Many of Ms. Shell's other accusations – *e.g.* that Ms. Henderson "crawled" into the room and hid – are events that are not shown on the video clips at all.  Thus, by and large, this Court agrees with the Magistrate Judge that Ms. Shell's submission of video clips was unnecessary, and that awaiting the preparation of and submitting a written transcript would have sufficiently conveyed Ms. Shell's arguments.

This is not to say that there is any particular protocol dictating the appropriate form for the submission of evidentiary material in support of a motion.  Traditionally, courts have primarily entertained evidence of deposition testimony in transcript form, simply because that

---

[24]      Ms. Shell occasionally states in the video clips that she is going "off the record," yet the recording apparently continued, insofar as the subsequent "off the record" discussions are nevertheless included in the video clips.   Normally, going "off the record" means that the ensuing off-record discussion is not recorded by any means.

was the predominant way in which such evidence was obtained and kept.  As technology has developed, videotaped (and, here, videoconferenced) depositions have become more prevalent raising new questions about the appropriate format in which to present such material to the court – *e.g.* via raw video, captioned video, transcribed testimony, etc.  This Court is sensitive to the Magistrate Judge's belief that posting video clips of Mr. Henderson on the public record is inherently more intrusive into his personal privacy than filing of deposition transcripts would be.  In addition, the acrimony and mutual recriminations between the parties (both prior to and during this litigation) raises questions as to Ms. Shell's motivation in filing video clips, instead of transcripts.  However, decisions to embark *sua sponte* must always be made with great hesitation and circumspection.  Here, there was no apparent need to act with urgency; to the extent Mr. Henderson believed that the filing of the video clips exposed him to undue embarrassment, he could have moved of his own accord to strike or restrict access to them.

Even if the Court were to find that the Magistrate Judge abused her discretion in striking the video clips – a finding that this Court is unwilling to make – Ms. Shell has suffered no prejudice.  The Magistrate Judge granted Ms. Shell's request for more time to complete Mr. Henderson's deposition, but denied Ms. Shell's request for sanctions against Mr. Henderson for his (or perhaps his wife's ) prior deposition conduct.  Review of the video clips themselves does not compel a result different than that reached by the Magistrate Judge.  Accordingly, Ms. Shell's Objections on this issue are overruled.

e.  March 13, 2013 Order

In March 2013, Ms. Shell filed a motion for sanctions (**# 1096**) (captioned "Sixth Motion for Sanctions") against Mr. Blair, based on his failure to respond to various discovery requests.  That motion raised some issues as to the completeness of Mr. Blair's discovery responses

(namely, that he did not identify the interrogatory corresponding with each response, did not provide an answer regarding the membership of a particular internet group, and "g[ave] as an excuse for not responding to the other propounded interrogatories a bizarre conspiracy theory"), repeatedly complained about Mr. Blair's failure to swear to the responses under penalty of perjury, and raised concerns about Ms. Shell's ability (and responsibility) to respond to Mr. Blair's pending dispositive motion.

On March 12, 2013, the Magistrate Judge issued an order directing that Mr. Blair "file . . . a response to the [motion], only as to the issue of his alleged failure to swear his discovery responses under oath."   In the interim, Mr. Blair filed a substantive response (# 1101) to Ms. Shell's motion, arguing that his responses to appropriate interrogatories were complete and comprehensible, and that he objected to those interrogatories he had refused to respond to.  After receiving a copy of the Magistrate Judge's Order, he filed a supplemental response (# 1102) indicating that he did not have the responses sworn because he had difficulty locating a notary.

On March 14, 2013, the Magistrate Judge granted in part and denied in part (# 1120) Ms. Shell's motion.  The Magistrate Judge proceeded to analyze certain interrogatories propounded by Ms. Shell, and Mr. Blair's responses to them, and, with two exceptions, concluded that Ms. Shell's interrogatories sought either irrelevant material, or that Mr. Blair's responses to the interrogatories – which included a general objection to the largely irrelevant nature of Ms. Shell's requests -- were sufficient.  (The Magistrate Judge narrowed the scope of Ms. Shell's request with regard to the two exceptions, and directed Mr. Blair to respond to the interrogatories as narrowed.)  As to the issue of Mr. Blair's failure to swear to his responses, the Magistrate Judge found that his failure to do so was "brazenly thumbing his nose" at Ms. Shell and the Court, and awarded sanctions to Ms. Shell against him in the amount of $100.

Ms. Shell has filed Objections (**# 1124**) to the Magistrate Judge's order – more specifically, to the March 12, 2013 order insofar as it only required Mr. Blair to file a response addressing the notarization issue, but that the Magistrate Judge "subsequently entertained and sustained some of [his] objections" to her discovery requests. She goes on to complain that the Magistrate Judge, having already once examined those discovery requests, "proceeded to conduct a second analysis to further weed out interrogatories to which the defendant had to respond, essentially gutting discovery into my claims." She then devolves to a familiar complaint that the Magistrate Judge has exhibited favoritism towards Mr. Blair and takes issue with the $100 sanction imposed against him, contending that a preclusive sanction should have been awarded.

The Court finds no error in the Magistrate Judge's decision. To the extent Ms. Shell complains that the Magistrate Judge directed that Mr. Blair respond only to the issue of why he failed to swear to his responses, it is apparent that the Magistrate Judge felt that she had a complete record upon which to adjudicate Ms. Shell's complaints that Mr. Blair's substantive responses were incomplete. Indeed, the Magistrate Judge had the text of Ms. Shell's requests and Mr. Blair's responses; this, coupled with the Magistrate Judge's familiarity with the allegations and issues in this case, is sufficient to permit the Magistrate Judge to decide Ms. Shell's motion without needing further argument.

To the extent that Ms. Shell complains that the Magistrate Judge elected to reconsider prior rulings regarding the scope of the interrogatories to which Mr. Blair would be required to respond,[25] this Court notes that interlocutory decisions by a judge are always susceptible to reconsideration and modification. *See e.g. Collins v. State*, 60 F.3d 837, 1995 WL 405112 (10th

---

[25]    Presumably, Ms. Shell is referencing decisions made by the Magistrate Judge at the February 12, 2013 hearing.

Cir. July 10, 1995) (table) ("All orders prior to the district court's final order . . . were interlocutory; that is, subject to change while the case was ongoing").  By continuing to request adjudication of  the sufficiency of Mr. Blair's responses, Ms. Shell invited the Magistrate Judge to re-examine and reconsider both those responses and the propriety of Ms. Shell's requests in the first instance.  She cannot now complain that the Magistrate Judge found, upon further examination, that those requests were largely irrelevant.

Finally, to the extent that Ms. Shell contends that the Magistrate Judge's determination that Ms. Shell's discovery requests were indeed irrelevant, the issue is largely moot, as the Court has already dismissed all claims against Mr. Blair due to Ms. Shell's insufficient pleading of those claims.  Accordingly, Ms. Shell's objections to the Magistrate Judge's order are denied.

f. April 16, 2013 Order

In March 2013, Ms. Shell undertook the deposition of Ms. Swallow.  Several disputes concerning that deposition arose, and Ms. Swallow filed various motions seeking to terminate the deposition, the sanction Ms. Shell, etc.  By Order dated April 16, 2013 (**# 1166**), the Magistrate Judge agreed with Ms. Swallow that Ms. Shell's questioning of Ms. Swallow far exceeded the fairly limited scope of the claims remaining against her (that is, her alleged dissemination of the handout from one of Ms. Shell's seminars).  The Magistrate Judge found that Ms. Shell had spent considerable time during the deposition inquiring into "whether or not an attorney working in some capacity with [Ms. Shell] was disbarred," "whether Ms. Swallow is in communication with other defendants in this case after the filing of the litigation," or "the details about the child custody case of  . . . Ms. Swallow's daughter," among others.  The Magistrate Judge also found that, although both Ms. Shell and Ms. Swallow both unduly prolonged the deposition somewhat, Ms. Shell "often would repeat over and over the same

question in an attempt to obtain an unqualified response" and "attempt[ing] to dominate the proceedings rather than getting on with viewing relevant exhibits and posing questions about relevant matters." As a result, the Magistrate Judge granted Ms. Swallow's request that the deposition not be continued further.

Ms. Shell has filed Objections (**# 1168**) to that Order. It is not necessary to recite the various issues Ms. Shell raises; it is sufficient to observe that she disagrees with the Magistrate Judge's findings in most respects, that Ms. Swallow is largely culpable for the extended length of the deposition, and, again, that the Magistrate Judge has repeatedly demonstrated bias against Ms. Shell and in favor of the Defendants.

The ability to manage the discovery process is a task delegated to the Magistrate Judge, to be conducted in the exercise of her sound discretion. Here, the Magistrate Judge's perception of the reasons for the length of Ms. Swallow's deposition are a reasonable construction of the record. This Court has reviewed several portions of the transcript of Ms. Shell's questioning of Ms. Swallow, and based on that limited review, this Court agrees with the Magistrate Judge: although Ms. Swallow may have been non-responsive or argumentative at times, Ms. Shell bears much of the culpability for the length of the deposition. As just one example, the Court makes the following observations about the March 13, 2013 session. At page 18 of the transcript, Ms. Shell asks Ms. Swallow whether certain interrogatory responses she had given had been sworn to under the penalty of perjury. Ms. Swallow responded that they were sworn to during a prior court hearing, and Ms. Shell disagreed, stating that the documents she was inquiring about were different documents. Ms. Swallow insisted that her swearing to the responses at the prior hearing encompassed all of her discovery responses, and the subsequent 14 pages of transcript consist of Ms. Shell arguing with Ms. Swallow about the "ground rules" of the deposition,

instructing her that her answers were non-responsive, disputing Ms. Swallow's version of events, and generally belaboring the discussion, rather than simply accepting a straightforward answer that was given (to a largely irrelevant question) and moving on.

The Court acknowledges that the skill of dealing with an obstreperous deponent (assuming, without necessarily finding, that such a label is appropriate for Ms. Swallow) is one that even some lawyers struggle to master, mastery is expected by the Court and no relief will be granted to any party, represented or *pro se*, who bears substantial culpability for prolonging a deposition.   The Magistrate Judge properly concluded that Ms. Shell should not be granted additional time to continue her deposition of Ms. Swallow, and based upon this Court's review of the record, the Court cannot say that this decision was clearly erroneous, contrary to law, or an abuse of discretion.   Ms. Shell's Objections are therefore overruled.

## CONCLUSION

For the foregoing reasons, Mr. Henderson's Motion to Clarify (**# 870**) is **DENIED** as moot.  Ms. Swallow's Motion to Dismiss (**# 901**) and Motion for Summary Judgment (**# 907**, as supplemented **# 908**) are **DENIED**.  Ms. Shell's Motion for Default Judgment (**# 926**) against Defendants Connecticut DCF Watch, Georgia Family Rights, Inc., Families At Risk Defense Alliance, Francine Cygan, National Association of Family Advocates, and Illinois Family Advocacy Coalition is **DENIED** and the claims against those Defendants are **DISMISSED** pursuant to Fed. R. Civ. P. 41(b) for failure to prosecute.  Mr. Henderson's Motion for Summary Judgment (**# 934**) is **GRANTED IN PART**, insofar as Mr. Henderson is entitled to summary judgment on Ms. Shell's claim for secondary liability for copyright infringement, to the extent premised on a theory of vicarious infringement, and **DENIED IN PART** in all other respects. Mr. Blair's Motion to Dismiss or for Summary Judgment (**# 993**) is **GRANTED**, and the claims

against Mr. Blair are **DISMISSED** for failure to state a claim.  Ms. Shell's Objection (**# 841**) is

**SUSTAINED**, the Court **VACATES** the Magistrate Judge's September 11, 2012 Minute Order

(**# 838**), and directs that the Clerk of the Court place Docket # 818 under a Level 1, not a Level

2, restriction.  Ms. Shell's remaining Objections (**# 1027, 1073, 1114, 1124, 1168**) are

**OVERRULED**, and the Court **AFFIRMS** the Magistrate Judge's rulings underlying those

Objections.  Ms. Swallow's Objections (**# 1089**) are **OVERRULED** as moot.   Ms. Shell, Ms.

Swallow, and Mr. Henderson shall submit the pre-trial submissions referenced above on or

before **July 1, 2013**, and shall appear at a Pretrial Conference at **1:30 PM** on **July 25, 2013**, in

anticipation of a jury trial commencing in early September 2013.  Failure to comply with this

Order may result in the imposition of sanctions against the offending party.

Dated this 31st day of  May, 2013.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge