**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger**

Civil Action No. 09-cv-00309-MSK-KMT

**SUZANNE SHELL,**

     **Plaintiff,**

**v.**

**BRENDA SWALLOW,**

     **Defendant.**

_____

**OPINION AND ORDER DENYING DEFAULT JUDGMENT**
_____

     **THIS MATTER** comes before the Court pursuant to a hearing under Fed. R. Civ. P.

55(b) to determine whether the Plaintiff, Ms. Shell, is entitled to a default judgment against the

Defendant, Ms. Swallow.

## FACTS

     The Court recites primarily procedural facts here and addresses the substantive facts in its

discussion.  Ms. Shell, proceeding *pro se*, commenced this action against a broad array of

Defendants, all of whom were, at one point or another, members of an online community that

shared resources and information relating to "family advocacy."  That term loosely refers to

issues confronting parents and caregivers who are investigated or charged by state and municipal

child protective services agencies.  The online family advocacy community in question in this

case acrimoniously dissolved in or about 2005, when members began to publicly accuse each

other of incompetence, dishonesty, malfeasance, and even outright criminal behavior.  Ms. Shell

was initially an active and prominent participant in this online community before it unraveled.

She prepared material, presented live seminars, and frequently commented online with advice and strategies for other community members.  Although Ms. Shell left the online community before it unraveled,  her stature and her ongoing associations with others who remained in it made her a continued target of accusations and criticism.

Ms. Shell's claims against most of the Defendants are for unauthorized reproduction or posting of her copyrighted material on internet message boards.  In addition, she asserted claims against certain Defendants who made false assertions made about her and her work.  Eventually, all of Ms. Shell's claims resolved except those against Ms. Swallow.

Ms. Swallow was also a participant in the online community.  Ms. Shell alleges that in 2005, Ms. Swallow attended a seminar at which Ms. Shell was a presenter.  Ms. Shell alleges that in violation of her copyright and the terms of a contract governing seminar attendees,  Ms. Swallow gave the seminar materials to a third party who then posted them online.  Ms. Shell's claims against Ms. Swallow are: (i) copyright infringement, in violation of the Copyright Act, 17 U.S.C. § 101 *et seq.*; (ii) misappropriation of trade secrets in violation of the Colorado Uniform Trade Secrets Act ("CUTSA"), C.R.S. § 7-74-101 *et seq.*; and (iii) common-law breach of contract.

The Court scheduled a jury trial on these claims for September 30, 2013, but Ms. Swallow did not appear.  Accordingly, the Court entered default against Ms. Swallow under Rule 55(a).  The Court proceeded to conduct a hearing as to whether Ms. Shell was entitled to a default judgment against Ms. Swallow under Rule 55(b).  Ms. Shell put on testimonial evidence from three witnesses, Karen (Kay) Henson, Christine Korn, and Gregory Hession.  She also offered her own testimony, submitted various documents, and argued in favor of entry of a default judgment against Ms. Swallow.  On October 1, 2013, the Court made oral findings of fact

and conclusions of law, finding that Ms. Swallow had failed to show that Ms. Swallow had, in

fact, disseminated the seminar materials.  Thus, the Court entered judgment in favor of Ms.

Swallow.

Ms. Shell appealed that ruling (and others) to the Tenth Circuit Court of Appeals.  On

August 7, 2015, the Court of Appeals vacated this Court's judgment and findings, concluding

that the Court had failed to give Ms. Shell adequate notice that it was requiring her to put on

evidence sufficient to establish each of her claims.  *Shell v. Henderson*, ___ Fed.Appx. ___, 2015

WL 4665701 (10th Cir., Aug. 7, 2015).  The Court of Appeals remanded the matter to this Court

to either: (i) grant Ms. Shell a default judgment against Ms. Swallow, limiting its Rule 55(b)

hearing to the question of damages; or (ii) upon proper notice to Ms. Shell, conduct a Rule 55(b)

hearing that required Ms. Shell to establish both her entitlement to relief against Ms. Swallow

and the appropriate quantification of damages. *Id.*   In a November 6, 2015 Order **(# 1267)**, this

Court took the latter path, setting a continued Rule 55(b) hearing for December 30, 2015 and

advising Ms. Shell that the purpose of the hearing was to both "determine the sufficiency of Ms.

Shell's substantive claims against Ms. Swallow and to determine the appropriate amount of

damages to award to Ms. Shell on any claims found to be sufficient."

Subsequently, the Court advised **(# 1271)** Ms. Shell that it would consider all of the

evidence she had previously presented at the September 30, 2013 hearing and that, at the

December 2015 hearing, Ms. Shell needed only to present whatever additional witnesses and

exhibits she thought necessary.  Prior to the hearing, Ms. Shell requested a jury trial as to any

damages awardable for copyright violation.  At the December 30, 2015 hearing, the Court

bifurcated the question of liability from damages in order to preserve any jury trial right Ms.

Shell had on the question of damages.  The Court advised Ms. Shell that in the event she was

3

entitled to judgment against Ms. Swallow on the copyright claim, a jury trial would be scheduled

for consideration of statutory damages.

At the hearing, Ms. Shell initially stated that she had no new evidence to present, but then

offered her own testimony and tendered additional exhibits, marked as Exhibits 1001 to 1323.[1]

She made a closing argument and the Court engaged her in further colloquy, particularly with

regard to whether any losses she sustained were due to Ms. Swallow's actions or due to the

demise of the online group.

The Court has considered all of the evidence presented at the two hearings and Ms.

Shell's arguments and is now prepared to rule.

## <u>ANALYSIS</u>

### A.  Standard of review

Rule 55(b)(2) provides that, once default has been entered against a defendant, the

plaintiff "must apply to the court for a default judgment."  The Court may conduct such hearings

as are necessary to determine whether to enter such a judgment, including hearings to "establish

the truth of any allegation by evidence" or to "investigate any other matter."  *Id.* at(b)(2)(C), (D).

Given the conclusory nature of Ms. Shell's *pro se* pleadings and the absence of meaningful

factual development of the claims against Ms. Swallow through dispositive motions, the Court

found it appropriate to look beyond the Amended Complaint and require Ms. Shell to adduce

evidence that would establish her claims against Ms. Swallow.

Ms. Swallow is deemed to have conceded any "well-pled" facts asserted by Ms. Shell,

but does not admit conclusory assertions or contentions of law.  *Shell,* 2015 WL 4665701; *see*

*also* Wright & Miller, et al., <u>Federal Practice and Procedure</u>, Civil § 2688 ("Even after default,

---

[1]     Ms. Swallow did not appear at the December 30, 2015 hearing.

however, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action").  Where the Court requires evidentiary proof under Rule 55(b)(2)(C), this would suggest that the Court applies a standard is akin to that employed by the Court for purposes of evaluating summary judgment motions: Ms. Shell must come forward with colorable and admissible evidence sufficient to establish each element of her claim(s), but the Court construes such evidence in the light most favorable to Ms. Shell and draws reasonable inferences in her favor.

The Court is also cognizant of Ms. Shell's *pro se* status and thus liberally construes her pleadings.  *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972).  However, such status does not relieve her of her substantive obligations of proving each claim with competent evidence.  *See McNeil v. U.S.*, 508 U.S. 106, 113 (1993); *Ogden v. San Juan County*, 32 F.3d 452, 455 (10th Cir. 1994).

### B. Findings of fact

Based on the evidence produced at the two hearings, the Court makes the following findings of fact.[2]

---

[2]   Based on the Court's observations of Ms. Shell and a review of her testimony and the accompanying exhibits, the Court finds that Ms. Shell's testimony often fails to clearly distinguish between events of which Ms. Shell has personal knowledge; events which Ms. Shell did not personally observe but describes as if she had, basing her representations on hearsay accounts of the events from others or her own speculation about what might have occurred; and conclusions that Ms. Shell has reached about events that she may or may not have been present for.

   In addition, it is sometimes difficult to ascertain whether Ms. Shell is asserting that a particular act was specifically performed by Ms. Swallow or by others.  Ms. Shell often refers to acts performed by "they" or "them," without specifying who "they" are.  Most often, it appears that Ms. Shell is referring to some or all of the other Defendants in this case.  For example, Ms. Shell often describes harmful acts that "they" directed at her.  When pressed to identify who "they" was, Ms. Shell explained that she was referring to the former Defendants in this case and "their associates," presumably meaning other members of the family advocacy community.  Because there is no evidence establishing an agency or other  relationship through which Ms.

Ms. Shell has spent many years in the field of "family advocacy" – that is, advising and assisting parents, guardians, and children who are the subject of investigations or allegations by governmental child protective services agencies.  Ms. Shell conducted research into various aspects of family advocacy, authored books and materials to be used by families, attorneys, mental health professionals and others involved in such proceedings, gave presentations and seminars on the subject, and appeared as an expert witness in legal and administrative proceedings in this field.  Ms. Shell testified about recognition she received for the quality of her work, and Gregory Hession, an attorney practicing in the field of family law, also praised Ms. Shell's thoroughness and effectiveness.  Ms. Shell derived significant income from appearance fees, publishing, and other activities in conjunction with this work.

In 2003, Ms. Shell began organizing and presenting seminars on family advocacy topics in various states.  In preparation for these seminars, she prepared a lengthy set of materials that included historical information, summaries of regulatory provisions and caselaw, and strategic considerations and advice.  As pertinent here, Ms. Shell made presentations in Florida in 2004.  Karen (Kay) Henson, a legal assistant at a law firm focusing on divorce and family law matters, was the organizer of the conferences and Ms. Shell was the presenter.  At some conferences, Ms. Henson was assisted by Ms. Swallow, who was sometimes identified as a person for prospective attendees to contact for more information.

Attendance at the seminars was conditioned on attendees signing a contractual agreement with Ms. Shell.   The contract appears to have two parts.  First, attendees signed a one-page agreement (**Exhibit 1001**) containing nine enumerated provisions. Among other things, the provisions recited that "the content of this seminar is copyrighted" and that Ms. Shell was the

---

Swallow can be held liable for acts committed by others, the Court disregards evidence pertaining to the acts of the other Defendants.

owner of such copyright; that attendees would not "create, own, copy or distribute any written handout" from the seminar "except upon pre-paying a license fee" of $ 300,000 to Ms. Shell; that attendees would not "disseminate any of the information presented in this seminar to" employees of any federal, state, or municipal agency; and that attendees who did not agree with the terms of the contract would be required to leave the seminar.  The contract also incorporated by reference a one-page document entitled "Copyright Notice/Security Agreement" (**Exhibit 1009**, p. 2).  This document, thick with impenetrable legalese, appears to primarily require that attendees agree not to use the seminar handouts for "commercial/financial gain" without first obtaining Ms. Shell's consent.[3]  (The notice appears to expressly permit "personal, non-commercial use" of the information, however.)  The notice defined the term "commercial/financial gain" to include using the seminar materials "to forward and/or enhance the [attendee's] claims in . . . any public or private venue in any manner which is inconsistent with promoting and protecting the fundamental human right to family association"; to use the materials "in an effort to violate anyone's procedural, constitutionally or statutorily protected rights"; to use the materials to "obtain any personal, commercial, financial, professional, or other non-tangible benefit for the [attendee]"; or to use the materials to "inflict harm" upon Ms. Shell.

The claims against Ms. Swallow arise from a seminar in Fort Lauderdale, Florida in March 2005.  Ms. Swallow attended that seminar.  Ms. Shell concedes that she cannot produce a contract signed by Ms. Swallow from this seminar but she offers two explanations.

First, she contends that Ms. Swallow formally signed the contract, then later "stole" her own signed contract back.  In support of this contention, Ms. Shell relies upon Ms. Henson's

---

[3]      The bulk of the document was devoted to purportedly creating a "security interest" in favor of Ms. Shell in all of the attendee's property and assets to secure against the attendee's unauthorized use of the seminar materials.

testimony that Ms. Henson manned the table that attendees had to pass in order to enter the seminar room, that Ms. Henson required everyone to sign the contract, and that no one refused to sign the contract.  (Ms. Henson did not testify to a specific recollection of Ms. Swallow signing, however.)  Ms. Henson testified that she then took all of the signed contracts, placed them in a manila envelope, and left them in a box beneath the projector in the seminar room.  Ms. Shell speculates that Ms. Swallow was somehow able to access that envelope and removed her own signed contract, although no witness testified about having observed Ms. Swallow doing so.  (Ms. Shell concludes that this is what occurred, because several years later, Ms. Swallow taunted Ms. Shell in an internet message board post, stating that "Mrs. [Shell] will tell you she has NO SIGNED CONTRACT FROM ME LOL Cause I'm sitting here looking at it.")

Ms. Shell's second explanation for the absence of a contract signed by Ms. Swallow is that Ms. Swallow read the contract and manifested her acceptance of the terms by attending the entirety of the seminar.  Both Ms. Shell and Ms. Henson testified that they observed Ms. Shell reading a copy of the contract posted on the wall of the hallway outside the seminar room, and that thereafter, Ms. Swallow proceeded to attend the entirety of the seminar.

In or about July or August 2005, when the disintegration of the family advocacy community was underway, Ms. Swallow had a falling out with Ms. Henson and/or Ms. Shell.  Ms. Henson requested that Ms. Swallow return the seminar handout and "certificate"[4] but  Ms. Swallow refused.

---

[4]      It appears that Ms. Shell and Ms. Henson formed an organization known as the Family Rights Advocacy Institute ("FRAI"), that, among other things, "certified" qualified individuals to act as "family advocates" with the Institute's blessing.  It appears that Ms. Swallow initially obtained such a certification from FRAI, but that Ms. Henson chose to cancel Ms. Swallow's certification.

In or about April 2006, Ms. Henson discovered that a copy of the seminar handout had been posted on a website called thetruthistold.com, owned by an individual named William (Billy) Wiseman.   Mr. Wiseman's posting of the material on his website caused an announcement to be posted automatically to the "AFRA website"  -- that is, a message board registered to the American Family Rights Association, the hub of the online family advocacy community – to which several thousand members of the family advocacy (apparently including Ms. Henson but, by this point, not Ms. Shell) subscribed.   Ms. Henson then wrote an email (**Exhibit 1003**) to Ms. Shell, advising her of the fact and suggesting that it was Ms. Swallow who gave the information to Mr. Wiseman.[5]   Ms. Shell then contacted Mr. Wiseman about the posting, and within "a couple of weeks," the materials were removed from the website.  The record does not indicate whether Ms. Shell asked Mr. Wiseman how he came into possession of the seminar materials, nor, if she did ask, what his response was at this time.  Ms. Shell is unable to state how many (if any) people viewed the materials on Mr. Wiseman's website during the short period in which they were accessible.

At some point in or about 2006, litigation ensued among various members of the family advocacy community, and Ms. Shell asserted claims in an action in California state court against a variety of individuals, including Mr. Wiseman.  In 2008, Mr. Wiseman moved *pro se* to dismiss Ms. Shell's claims against him.  Mr. Wiseman's motion is somewhat discursive,[6] but it mentions in passing that "Brenda Swallow sent me a pdf file that [Ms. Shell] gave to people at her seminar held in Florida and I took it apart and used copyscape.com to find out where it came

---

[5]    Ms. Henson was not asked to explain why she assumed that Ms. Swallow was the culprit, and this assumption is thus conclusory.

[6]    At the December 30, 2015 hearing, Ms. Shell offered her opinion that Mr. Wiseman "has brain damage and has cognitive disabilities" and that he "is easily persuaded as to what the truth is or isn't," but that "when he's not under influence, he will tell the truth."

from and that pdf file was taken from a government website. . . ."  This is the only evidence that Ms. Shell proffers to establish that Ms. Swallow gave the seminar materials to Mr. Wiseman.

Ms. Shell states that, beginning in 2006, offers for her to speak at seminars suddenly stopped.  It is somewhat difficult to determine the actual cause of this event – more particularly, whether the offers stopped coming because Ms. Shell's seminar materials had been briefly posted on Mr. Wiseman's website, or because of some other event(s).  At the September 30, 2013 hearing, Ms. Shell seemed to testify that the offers stopped because sponsors "were citing the disputes that were going on between me and AFRA [wherein participants were now openly feuding with one another] . . .  I was not participating [ ] when these disputes were happening. But they [the sponsors] perceived that I was . . . ."  At the December 30, 2015 hearing, Ms. Shell seemed to initially suggest instead that Ms. Swallow's distribution of the seminar materials was the cause of the evaporation of speaking offers.  The Court asked Ms. Shell "[d]id anybody tell you that the reason they weren't hiring you for seminars was because the seminar material was posted on the internet by Mr. Wiseman?"  Ms. Shell initially responded that "What they do tell me is that the information is available on the internet, that . . . they don't have to pay me . . . People say this information is out there on the seminar, why should I pay someone to give it to me?"  Although this testimony seems to suggest that Ms. Shell had specific discussions with seminar organizers about whey they were no longer hiring her, her subsequent testimony suggests the opposite.  The Court specifically asked whether Ms. Shell had inquired of anyone "why you weren't getting calls for seminars anymore" and Ms. Shell responded "Who would I call and ask why they weren't calling me?"[7]

---

[7]     As discussed below, there is considerable evidence that Ms. Shell stopped receiving speaking offers several months before Mr. Wiseman posted the seminar materials.

This is not the first lawsuit brought by Ms. Shell against Ms. Swallow.  In February 2006,

Ms. Henson and Ms. Shell jointly sued Ms. Swallow in the Circuit Court for Hernando County,

Florida.  Ms. Shell ultimately obtained a default judgment against Ms. Swallow.  Ms. Swallow

has previously raised the issue of whether the Florida action amounted to *res judicata* for

purposes of this case, and in its November 6, 2015 Order setting the most recent Rule 55 hearing,

the Court expressly instructed Ms. Shell to produce "a copy of the operative Complaint and final

Judgment issued in the Florida action, along with any motion papers or other documents

necessary to reveal the nature and contents of the claims actually litigated and resolved in that

action."  At the hearing, Ms. Shell produced her February 2006 Verified Complaint from the

action, as well as the Florida court's July 3, 2006 Judgment Granting Monetary Damages and

Other Relief, but no other materials.

The Verified Complaint generally recites how Ms. Shell and Ms. Henson founded an

entity known as the Family Rights Advocacy Institute ("FRAI"), and that Ms. Swallow was

affiliated with that organization until a 2005 falling-out between the women.  Ms. Swallow

subsequently "began an Internet campaign of defamation against the Plaintiffs."  Specifically,

Ms. Shell asserted: (i) a claim sounding in libel against Ms. Swallow, in that between 2005 and

2006, Ms. Swallow "published a series of Internet email messages which contained false

statements about Plaintiff Shell," such as that Ms. Shell had engaged in the unauthorized practice

of law; that she had engaged in fraud, forgery, and other crimes; that she was unethical and

incompetent in her work; and that she was "crazy" and "paranoid"; and that she threatened

people with a firearm and attempted to run them over with her car, among many others; (ii) libel

*per se*, in that the same messages exposed Ms. Shell to disrepute in her profession as a family

rights advocate; and (iii) invasion of privacy, in that Ms. Swallow publicly disclosed "details

about the private life of Shell that had not been disclosed to the public," including matters of

"frequent and indiscriminate marital indiscretions in Shell's marriage."  Ms. Shell's Prayer for

Relief sought unspecified money damages, a "retraction of all false statements," an injunction

against Ms. Swallow from participating in "any online bulletin boards, forums, chat rooms,

[etc.]" for a period of five years, and an injunction directing Ms. Swallow to "desist from

representing herself as a trained and/or certified and/or any other designation as a family

advocate" and requiring her to return "all Institute materials  . . . so that they can be retrieved to

protect trade secrets."

    Ms. Swallow did not appear or defend in the action and Ms. Shell sought a default

judgment against her on or prior to Monday, April 17, 2006.  (The precise date of Ms. Shell's

motion is not apparent from the record and Ms. Shell has not produced a copy of her motion for a

default judgment, but the court's Order indicates that default was entered against Ms. Swallow

on April 17, 2006.)  This is close in time, if not simultaneous with, Ms. Henson's Saturday, April

15, 2006 e-mail to Ms. Shell, notifying her of the publication of the seminar materials on Mr.

Wiseman's website.  The Judgment indicates that the Florida court held an "evidentiary hearing"

at some point in time, at which Ms. Shell apparently participated (but Ms. Swallow did not).  Ms.

Shell has not produced a transcript or minutes from that hearing, nor did she describe for this

Court the contents of that hearing.  On July 3, 2006, the Florida court entered a default judgment

in favor of Ms. Shell that, among other things: (i) awarded Ms. Shell $ 8,000 in "lost seminar

revenue," and certain court costs and expenses; (ii) enjoined Ms. Swallow from "threatening" or

"slandering" Ms. Shell; (iii) enjoined Ms. Swallow from "disseminating copies of [Ms. Shell's]

copyrighted materials whether by physical or electronic copy" and required Ms. Swallow to

"immediately return all copyrighted materials" to Ms. Shell and to "provide . . . the names of recipients that [Ms. Swallow] disseminated materials to."

### C. Conclusions of law

#### 1. *Res judicata*

The Court turns first to the question of whether any of Ms. Shell's claims against Ms. Swallow are barred by the doctrine of *res judicata* as a result of Ms. Shell obtaining a judgment against Ms. Swallow in the Florida action.

*Res judicata* precludes re-litigation of issues that were actually decided or could have been decided in a prior action. *Santana v. City of Tulsa*, 359 F.3d 1241, 1246 n. 3 (10th Cir.2004); *Cruz v. Benine*, 984 P.2d 1173, 1176 (Colo. 1999).[8] It applies where: (i) the prior suit resulted in a final judgment on the merits; (ii) the same parties were involved in both suits; and (iii) the same cause of action is pressed in both suits. *Id.* To determine whether the same cause of action is at issue in both cases, the Court looks to "all claims or legal theories that arise from the same transaction, event, or occurrence," applying a pragmatic test that "giv[es] weight to such considerations as whether the facts are related in time, space, origin, or motivation, and whether they form a convenient trial unit." *Wilkes v. Wyoming Dept. of Employment*, 314 F.3d 501, 504 (10th Cir.2002). It is undisputed that the Florida suit resulted in a judgment on the

---

[8]     In deciding the scope of *res judicata* effect to be given a foreign judgment, this Court gives it the same effect as would state courts in the jurisdiction in which the Court sits – that is, Colorado. *See generally Semtek Intern. Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001). Colorado law affords full preclusive effect to  judgments from foreign courts, *In re Marriage of Seewald*, 22 P.3d 580, 583 (Colo.App. 2001), as well as to default judgments. *Aspen Plaza Co. v. Garcia*, 691 P.d 763, 764 (Colo.App. 1984). In any event, Florida law is effectively identical to that of Colorado in the pertinent respects here. *See Elbadramany v. Bryson Crane rental Services, Inc.*, 630 So.2d 214, 216 (Fl.App. 1993) (default judgments are given *res judicata* effect in Florida); *Topps v. State*, 865 So.2d 1253, 1254-55 (Fl. 2004) (indicating that *res judicata* bars claims actually litigated as well as those that could have been litigated and listing elements to be established).

merits in favor of Ms. Shell and that Ms. Shell and Ms. Swallow were parties to both that action and this one. The only question, then, is whether the Florida action involved the same cause(s) of action presented here.

In considering this issue, the Court notes that it is well-established that courts may raise the issue of preclusion *sua sponte*. In *Arizona v. California*, 530 U.S. 392, 412 (2000), the Supreme Court explained that "if a court is on notice that it has previously decided the issue presented, the court may dismiss the action *sua sponte* . . . This result is fully consistent with the policies underlying res judicata: it is not based solely on the defendant's interest in avoiding the burdens of twice defending a suit, but is also based on the avoidance of unnecessary judicial waste." (The Court ultimately declined to do so in that case, finding that the issue had not <u>actually</u> been resolved in prior litigation, and that "trial courts must be cautious about raising a preclusion bar *sua sponte*" when "no judicial resources have been spent on the resolution of a question." *Id.* at 412-13.) Although *Arizona* might be read to limit a court's ability to *sua sponte* invoke principles of *res judicata* to situations in which the claims were <u>actually</u> decided in earlier litigation, numerous other courts have read *Arizona* more broadly, finding that trial courts are free to *sua sponte* invoke the full reach of the doctrines of *res judicata* and collateral estoppel (that is, preclusion of claims or issues that were <u>or could have been</u> litigated in the prior suit) where circumstances warrant. *See e.g. Clodfelter v. Republic of Sudan*, 720 F.3d 199 (4th Cir. 2013) (collecting cases).

Ms. Shell is correct that the Florida suit, filed in February 2006, predates Ms. Swallow's alleged distribution of the seminar handouts in or about April 2006, such that the Verified Complaint in that action does not – and indeed, could not – make reference to that distribution. But that is not the end of the inquiry. The Florida court's Judgment makes clear that, at some

point in time after April 17, 2006 – that is, after Ms. Shell learned of Mr. Wiseman's publication of the seminar materials -- the Florida court held a default judgment hearing at which Ms. Shell appeared.

Although Ms. Shell has not provided the Court with a transcript of that hearing[9] this Court can infer from the contents of the default judgment that Ms. Shell constructively amended her claims somewhat in that hearing.  Most notably, the Judgment twice refers to Ms. Shell's "copyrighted materials."  The Verified Complaint never refers to Ms. Shell having a copyright in any materials; it speaks only of "Institute materials" that are described as being "trade secrets." Moreover, the Verified Complaint contains no allegations that Ms. Swallow ever distributed the "Institute materials" to anyone; at best the Prayer for Relief hypothesizes that this might occur in the future.  But the Florida court's Judgment seems to suggest that Ms. Swallow had "disseminated materials to [others]."  Both discrepancies can be explained by assuming that Ms. Shell advised the court at the evidentiary hearing of her recent discovery that Ms. Swallow had disclosed the seminar materials to Mr. Wiseman.

If there was a constructive amendment of the claims in the Verified Complaint to include new allegations about Ms. Swallow's distribution of the seminar materials, then the copyright infringement claim was effectively litigated in the Florida suit.  Even if it not actually litigated, it could have been litigated in the prior action. All three theories asserted here arise from the alleged transfer of Ms. Shell's seminar materials to Mr. Wiseman and the posting of them on-line.  All of these events occurred and were known to Ms. Shell prior to the evidentiary hearing

---

[9]      This would seem to be encompassed by this Court's November 6, 2015 directive that Ms. Shell produce "any . . . other documents necessary to reveal the nature and contents of the claims actually litigated and resolved in that action".

and entry of Judgment in the Florida case. Accordingly, the Court concludes that Ms. Shell's claims in this action are barred by the doctrine of *res judicata*.

However, assuming that such claims are not barred as a matter of law, upon evaluation of the evidence presented, the Court finds that Ms. Shell cannot prevail, even in the absence of opposition.

### 2.   **Copyright infringement**

To establish a claim for copyright infringement, Ms. Shell must show: (i) she possessed a valid copyright in an original work; and (ii) Ms. Swallow copied one or more protected elements of that work without permission. *La Resolana Architects, PA v. Reno, Inc.*, 555 F.3d 1171, 1177 (10th Cir. 2009).

#### (a).   Existence of a valid copyright

Turning first to the question of whether Ms. Shell's seminar materials were copyrighted, Ms. Shell seemed to assume this during the Rule 55 hearing but did not put on actual evidence of her registration of that copyright. This defect alone would seem to be fatal to Ms. Shell's copyright infringement claim.

Nevertheless, the Court observes that, at the dispositive motion phase of this action, Ms. Shell indicated that the seminar handout was "registered as part of the collection of Unpublished Proprietary Documents registered October 23, 2008." *Docket* # 872 at 6.[10] For purposes of this ruling, then, the Court assumes that Ms. Shell registered the seminar materials with the Copyright Office on October 23, 2008.

---

[10]   This Court seemingly adopted this contention, acknowledging it in the Court's May 31, 2013 Opinion and Order. *Docket* # 1172 at 6-7. The Court notes at this time, however, that Docket # 872 does not include any actual evidence of registration of the Florida seminar materials beyond Ms. Shell's mere say-so.

Obviously, Ms. Swallow's alleged dissemination of the seminar materials to Mr. Wiseman in April 2006 occurred prior to Ms. Shell's registration of those materials with the Copyright Office in 2008, thus there is no direct infringement of the registered copyright.

It is possible, however, for a defendant to infringe copyright in a work prior to the author's registration of the work with the Copyright Office.  In such circumstances, the author of the unregistered work is limited in the remedies that are available for infringement. Most notably, the author may not obtain an award of statutory damages under 17 U.S.C. § 504(c) or attorney fees under 17 U.S.C. § 505. 17 U.S.C. § 412; *see also Latin American Music Co. v. American Society of Composers, Authors, and Publishers*, 642 F.3d 87, 90 (1st Cir. 2011).  Thus, assuming proof of infringement,  Ms. Shell is required to show that she sustained <u>actual</u> damages as a result of the infringement.  17 U.S.C. § 504(a)(1), (b).  The Court will address that issue below.

### (b).   Distribution by Ms. Swallow

Assuming, for the moment, that Ms. Shell had an unregistered copyright in the seminar materials as of April 2006, she must also show that Ms. Swallow infringed on that copyright. Among the rights inuring to the owner of a copyright is the exclusive right to reproduce the work and to distribute copies of the work to others.  17 U.S.C. § 106(1), (3).  Thus, if Ms. Shell can show that Ms. Swallow reproduced the seminar materials or distributed a copy of the work to Mr. Wiseman without first obtaining Ms. Shell's permission, Ms. Shell would satisfy her burden of establishing copyright infringement.

Ms. Shell's evidence that Ms. Swallow was the person who provided a copy of the seminar materials to Mr. Wiseman is limited to Ms. Wiseman's statement to that effect in an unsworn brief filed in another lawsuit.  Mr. Wiseman's statement is unambiguously hearsay: it is

a factual assertion ("Ms. Swallow sent me the seminar materials"), made by a declarant (Mr. Wiseman), outside of the Rule 55 hearing here (Ms. Shell did not call Mr. Wiseman as a witness), and is offered by Ms. Shell for its truth (that Ms. Swallow did indeed send the materials to Mr. Wiseman). Fed. R. Evid. 801(c). Ms. Shell has not asserted, nor is there any evidence to suggest, that the statement would fall within any of the recognized exceptions to the hearsay rule.[11] As such, Mr. Wiseman's statement is properly excluded as hearsay.

Ms. Shell argues that evidentiary objections that Ms. Swallow could waive – such as objections to the receipt of hearsay evidence – are deemed waived as a result of her default and that the Court is prohibited from considering such evidentiary defects *sua sponte*. Ms. Shell's initial contention – that a party may waive an evidentiary objection by failing to raise it at the appropriate time – is, of course, sound. *See Talavera ex rel. Gonzalez v. Wiley*, 725 F.3d 1262, 1267 (10th Cir. 2013), *citing* Fed. R. Evid. 103(a). However, this merely states a rule of waiver for appellate purposes: a party who fails to lodge the appropriate objection at the time of trial may not thereafter argue on appeal that the court should not have considered the evidence. The rule does not operate to require a court to receive patently-inadmissible evidence simply because no objection has been lodged by the opponent; in other words, the absence of an objection permits the court to receive the otherwise-admissible evidence, but does not compel it to do so.

---

[11]     Mr. Wiseman's statement does not involve prior testimony where he was subject to cross-examination, Fed. R. Evid. 801(d)(1); he is not Ms. Shell's opposing party, nor did Ms. Shell put on evidence to suggest that he made the statement as an authorize agent of Ms. Swallow or that Ms. Swallow adopted his statement (in fact, Ms. Shell put on evidence that Ms. Swallow denies Mr. Wiseman's statement), Fed. R. Evid. 801(d)(2); the statement falls within none of the exceptions of Rule 803; Ms. Shell's conclusory assertions of being unable to contact Mr. Wiseman after initially serving him with process in this suit did not sufficiently establish Mr. Wiseman's unavailability for purposes of Rule 804(a), and in any event, his statement in the brief would not amount to former testimony subject to cross-examination by Ms. Swallow pursuant to Rule 804(b)(1), nor would Mr. Wiseman's statement about receiving the materials from Ms. Swallow be contrary to his pecuniary interests under Rule 804(b)(3).

*See e.g. Bellard v. Gautreax,* 675 F.3d 454, 461 (5th Cir. 2012) ("Although Bellard points out that the law in the Fifth Circuit is that 'unobjected to hearsay may be considered by the trier of fact for such probative value as it may have,' he incorrectly characterizes this as a requirement rather than permission to consider such evidence").  As noted above, a Rule 55 hearing is akin to consideration of a summary judgment motion directed against the plaintiff, and there is considerable authority for the proposition that a court may choose to decline to consider inadmissible hearsay at the summary judgment stage, even in the absence of an objection from the movant.  *Ward v. Jackson State Univ.*, 602 Fed.Appx. 1000, 1003 (5th Cir. 2015); *see generally Mays v. Rhodes*, 255 F.3d 644, 648 (8th Cir. 2001) ("While we review the record in the light most favorable to Mays as the non-moving party, we do not stretch this favorable presumption so far as to consider as evidence statements found only in inadmissible hearsay").  To hold otherwise would effectively throw out the Federal Rules of Evidence in Rule 55 hearings: few defendants in default will appear at a Rule 55(b) hearing simply to lodge evidentiary objections, leaving plaintiffs free to rely upon evidence bereft of foundation (to the point of possible fabrication), upon hearsay-upon-hearsay far removed from the initial declarant, or upon types of evidence expressly prohibited by the Federal Rules (admissions made in offers to compromise, subsequent remedial measures, plea negotiations, etc.).

Moreover, Ms. Shell herself adduced several reasons why Mr. Wiseman's hearsay statement might be unreliable. First,  Ms. Shell describes Mr. Wiseman as having "brain damage and cognitive difficulties," and opines that "he is easily persuaded as to what the truth is or isn't."[12]  Second, in deposing Ms. Swallow, Ms. Shell asked  whether Mr. Wiseman might have

---

[12]     Ms. Shell nevertheless opines that "when he's not under influence [of others], he will tell the truth."  Ms. Shell did not purport to have any personal knowledge of the circumstances under

obtained the seminar materials from a different source: "Q: Ms. Swallow, the only other person that attended that seminar who would have a reason to give Billy that handout would be Ann Durand.  Did she do it?"  (Ms. Swallow responded that "you would have to ask Ann Durand," but then denied having sent the materials to Mr. Wiseman.)   Indeed, the paragraph of Mr. Wiseman's brief that immediately follows the portion upon which Ms. Shell relies, Mr. Wiseman states that "[Ms.] Shell sued Brenda Swallow for sending me the seminar handout . . . and now she is accusing my friend Ann [Durand] of the very thing she sued Ms. Swallow for."  This statement, if treated the same as the statement Ms. Shell relies upon, suggests that Ms. Shell herself has some uncertainty as to who actually gave Mr. Wiseman the seminar materials.

In these circumstances, the Court would exercise its authority to decline to consider Mr. Wiseman's hearsay statement as admissible evidence.  Because Mr. Wiseman's statement is Ms. Shell's only evidence that Ms. Swallow distributed the seminar handouts, the Court must conclude that Ms. Shell has not carried her burden of showing that Ms. Swallow distributed the copyrighted material.

(c).  Actual damages

Even if the Court were to conclude that Ms. Shell had otherwise established a claim of copyright infringement against Ms. Swallow, there remains the issue of whether she can establish a loss caused by the infringement.   The Court undertakes this analysis in a limited sense, having orally granted Ms. Shell's motion to have any quantification of damages made by a jury.  Thus, the Court addresses damages only to ascertain whether Ms. Shell has come forward with any evidence that Ms. Swallow's acts caused Ms. Shell to suffer any injury for which a jury could award damages.

---

which Mr. Wiseman wrote the brief in question, and thus, has no apparent knowledge of whether Mr. Wiseman was being influenced by another person at that time.

As the holder of an unregistered copyright at the time of the infringement, Ms. Shell is entitled to recover only <u>actual</u> damages caused by Ms. Swallow's infringement (and any profits obtained by Ms. Swallow from such infringement, of which there is no evidence).  17 U.S.C. § 412, 504(b).  To establish that she is entitled to <u>any</u> actual damages, Ms. Shell must demonstrate some causal connection between Ms. Swallow's infringement and the particular injury claimed by Ms. Shell – the cessation of offers for future speaking engagements.  *See Dash v. Mayweather*, 731 F.3d 303, 313 (4th Cir. 2013).  In other words, Ms. Shell must show both that: (i) but-for Ms. Swallow's infringement, she would not have lost out on future speaking opportunities; and (ii) that the loss of the speaking opportunities flowed, naturally and probably, from Ms. Swallow's act of infringement.  *Cohen v. U.S.*, 100 Fed.Cl. 461, 478 (Fed.Cl. 2011).

As noted above, Ms. Shell unambiguously testified that offers for speaking engagements – her primary source of income – diminished beginning in 2006, before Mr. Wiseman published the seminar materials.  In addition,  Ms. Shell's testimony was more jumbled as to what caused those offers to diminish.  Ms. Shell first appeared to attribute the loss of offers to Ms. Swallow's actions, purportedly citing explanations she was given by seminar organizers themselves.  However, Ms. Shell later seemed to suggest that she had not had any conversations with seminar organizers directly (and thus, had no personal knowledge as to why offers were rescinded or never extended), and she appeared to attribute the loss of speaking engagements to a combination of Ms. Swallow's actions and the generally negative climate of the online family advocacy community, a situation unrelated to Ms. Swallow's infringement.  Certain evidence in the record suggests that the climate of hostility and accusations surrounding the disintegration of the family advocacy community is one, if not the most significant, cause of Ms. Shell's loss of speaking opportunities.

This fact is aptly demonstrated by Ms. Shell's Verified Complaint against Ms. Swallow in the Florida action.  Filed in February 2006, several months before Ms. Swallow allegedly gave the seminar materials to Mr. Wiseman (or, at least, before Mr. Wiseman published them on his website), Ms. Shell's Complaint alleges that Ms. Swallow's libelous statements "cause[d Ms. Shell] to be avoided by persons in the [family advocacy] Movement and lower her in the estimation of [the] family rights internet community; and severely harm[ed] her reputation . . . by [diminishing perceptions of her] skill, experience, qualifications, competence, integrity, and trustworthiness that her occupation and profession peculiarly requires."  Ms. Shell also alleged that she "has suffered . . . loss of business, impairment of standing in the family rights community, . . . an impairment of her ability to promote her training and products, and impairment of her ability to announce recent accomplishments and appointments and upcoming presentations, for fear that such announcements will unleash another round of defamatory publications [by Ms. Swallow]."[13] (Emphasis added.)

---

[13]     The Judgment awarded to Ms. Shell in the Florida case adds an interesting wrinkle to Ms. Shell's contention here that the publication of her seminar materials by Mr. Wiseman was the cause of her lost access to speaking engagements, essentially placing Ms. Shell in a "damned-if-you-do, damned-if-you-don't" situation.

Among the items awarded by the Florida court to Ms. Shell was $ 8,000 in damages for "lost seminar revenue."  If the Court assumes that the sums awarded in the Florida Judgment were strictly limited to the harms described in Ms. Shell's Verified Complaint in that action – that is, Ms. Swallow's defamatory postings about Ms. Shell's competence and ethics, but not Ms. Swallow's subsequent dissemination of the seminar materials – the finding that Ms. Swallow's defamatory postings cost Ms. Shell substantial seminar revenue would conclusively rebut Ms. Shell's contention here that the publication of the seminar materials was the cause of her lost speaking opportunities; to the contrary, the Florida court determined that Ms. Swallow's defamation of Ms. Shell caused those lost opportunities.  (Indeed, by virtue of the Florida court's findings, Ms. Shell would seem to be collaterally estopped from contending that the lost seminar revenue was caused by anything other than those defamatory postings.)

On the other hand, Ms. Shell could contend that she was able to place the issue of Ms. Swallow's dissemination of the seminar materials before the Florida court during the default judgment hearing.  This would preserve Ms. Shell's ability to make the same argument here – that it was the distribution of the seminar materials, not the defamatory postings, that cost her the

Having carefully examined the entirety of Ms. Shell's testimony here, the Court finds no instance in which Ms. Shell offered anything more than her own conjecture or speculation that Ms. Swallow's dissemination[14] of the seminar materials was the specific cause of a loss in future speaking opportunities. She offered inconsistent statements as to whether she spoke to seminar organizers to ascertain whether the public disclosure of the seminar materials was the reason why organizers rescinded existing speaking engagements or withheld future offers, and the Court is compelled to conclude that the statements in which she claimed to have had such conversations are actually  statements of Ms. Shell's speculation or conclusions, rather than affirmative representations of actual events within Ms. Shell's personal knowledge.  Ms. Shell's inability to

---

speaking engagements -- but it would place Ms. Shell in the position of conceding that Ms. Swallow's dissemination of the materials was actually litigated in the Florida action, thus precluding the claims here under *res judicata*.

[14]     Notably, Ms. Shell's theory that Ms. Swallow's dissemination of the seminar materials to Mr. Wiseman caused Ms. Shell to suffer a loss of future speaking engagements is untenable on its own.  Ms. Shell does not seem to suggest that Ms. Swallow's sending of the materials to Mr. Wiseman itself caused her to suffer some injury; rather, Ms. Shell's belief is that Mr. Wiseman's decision to post the materials publicly caused Ms. Shell to suffer harm.  Ms. Shell seems to assume that Ms. Swallow can somehow be held liable for Mr. Wiseman's decision to publish the seminar materials, but she does not articulate any cognizable legal theory that would result in Ms. Swallow's liability in such circumstances.

The law does contemplate the notion of "contributory copyright infringement," where a defendant "cause or materially contributes to another's infringing activities and knows of the infringement."  *Diversey v. Schmidly*, 738 F.3d 1196, 1204 (10th Cir. 2013).  Arguably, if Ms. Shell had shown evidence that Ms. Swallow directed Mr. Wiseman to post the materials or that she otherwise knew that sending Mr. Wiseman the seminar materials would cause him to also infringe Ms. Shell's copyright by publicly disseminating them, Ms. Shell might be able to invoke the doctrine of contributory infringement to hold Ms. Swallow liable for the injuries caused by Mr. Wiseman's publication of the materials.  But Ms. Shell offers no evidence of any communications between Ms. Swallow and Mr. Wiseman, much less any other evidence that suggests that Ms. Swallow directed or anticipated Mr. Wiseman's decision to publish the materials.  As such, the Court sees no way in which Ms. Shell can hold Ms. Swallow liable for Mr. Wiseman's decision to publish the materials publicly, leaving Ms. Shell has having to demonstrate an actual loss that flowed merely from the fact that Ms. Swallow shared the seminar materials privately with another person.

demonstrate any clear causal connection between Ms. Swallow's infringement and the loss of speaking opportunities offered to Ms. Shell, coupled with Ms. Shell's numerous assertions attributing the loss of speaking obligations to the disintegration of the online family advocacy community requires the Court to conclude that Ms. Shell has not come forward with any evidence sufficient to demonstrate any actual damages. Thus, Ms. Shell could not recover <u>any</u> amount of damages on her copyright infringement claim in any event.

Accordingly, Ms. Swallow is entitled to judgment on Ms. Shell's copyright infringement claim.

### 3.  **Misappropriation of trade secrets**

To establish a claim for misappropriation of trade secrets under the Colorado Uniform Trade Secrets Act, C.R.S. § 7-74-101 *et seq.*, Ms. Shell must show: (i) that she possessed a "trade secret" as defined by that Act; (ii) that Ms. Swallow disclosed or used that trade secret without Ms. Shell's consent; and (iii) that Ms. Swallow used "improper means" to do so.  *Gates Rubber Co. v. Bando Chemical Industries, Ltd.*, 9 F.3d 823, 847 (10th Cir. 1993).

### (a).  Existence of a trade secret

Although Ms. Shell frequently refers to her seminar materials as being "proprietary" or "trade secrets," she did not elaborate on the features that make them so.  The Act defines a "trade secret" as "the whole or any portion of . . . any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession that is secret and of value."  C.R.S. § 7-74-102(4).  Ms. Shell does not specifically parse the seminar handout to indicate which portions fit this definition; certainly, some of them do not – the recitations of applicable laws governing child protective services proceedings,

descriptions of hearing procedures, and collections of case headnotes or statutory provisions cannot possibly be considered "secrets."

A portion of the handout contains strategies for parents involved in such proceedings and other bits of advice that were devised by Ms. Shell herself.  The Court will assume, for the moment, that these are the "secret" components of the seminar materials, but even that assumption is problematic.  In *Saturn Systems, Inc. v. Militare,* 252 P.3d 516, 521-22 (Colo.App. 2011), the court set forth a series of factors that should be considered in determining whether a given item was a "trade secret," including the extent to which the information is known within and outside the business, the amount of money or effort it took to obtain the information and that competitors would have to expend to duplicate it, and the value that the information gives the holder over its competitors.  The Court has some doubt that Ms. Shell's advice and strategies set forth in the handout are particularly unique or otherwise unknown to others; the Court suspects that most experienced family law attorneys would give clients more or less the same advice that Ms. Shell does -- to refuse to answer investigators' questions, to review files, to record encounters, and so on.

Even assuming, without necessarily finding, that at least this portion of the seminar materials <u>could</u> qualify for trade secret protection,[15] the Act also requires that the owner of an

---

[15]     Although not necessarily pertinent, the Court notes that now that Ms. Shell has registered the seminar materials with the Copyright Office, it will be difficult for her to continue to claim that the materials remained "secret" after October 2008.  To register a copyright, the owner must deposit a copy of the work with the Copyright Office.  17 U.S.C. § 408(b).  The public is permitted – indeed, expected – to inspect those deposited works, in part to ensure that future works do not infringe.  *See* 37 C.F.R. § 201.2(b)(1) (request to inspect deposited works). Because there are no restrictions – other than those secured by the Copyright Act itself – on the public's ability to review, summarize, and disseminate the contents of a work deposited with the Copyright Office, any claim by Ms. Shell that the seminar materials retained any element of secrecy after October 2008 becomes untenable.  *Compare Computer Assoc's Intern., Inc. v. American Fundware, Inc.*, 831 F.Supp. 1516, 1629 (D.Colo. 1993) (discussing procedure by

alleged trade secret to "take[ ] measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes." *Id.* Those measures must be reasonable under the circumstances to maintain the secrecy of the information, but "extreme and unduly expensive procedures need not be taken." *Saturn*, 252 P.3d at 522. It is in this regard that Ms. Shell's claim of trade secret protection fails.

The record reflects that Ms. Shell hands out copies of the seminar materials to all seminar attendees – Ms. Shell typically aimed to have at least 25 attorneys attend each seminar as paying customers, whose attendance fees would subsidize the attendance costs of an additional (unspecified) number of parents, grandparents, guardians, social workers, and other interested professionals. Multiplied by several seminars a year, Ms. Shell was disclosing her materials to hundreds of attendees annually. The Court has profound doubt that such broad disclosure to a wide range of persons can ever constitute the type of "selected disclosure for limited purposes" contemplated by *Saturn*. The very notion of a trade secret is that it is jealously-guarded by the owner and disclosed only to a small or limited subset of individuals with whom the secret's owner wishes to enter into a future business relationship: an owner disclosing secret product designs to a manufacturer in anticipation of contracting out the product's manufacture, the licensing of a secret customer list to another entity that offers services that complement the list's owner's business, etc. Ms. Shell's disclosure of her "secrets" to a large number of seminar attendees, about whom Ms. Shell knows little or nothing and who generally have no further contact with her or her business, seems to stretch the concept of "trade secret" far beyond its normal meaning, regardless of the promises of confidentiality Ms. Shell extracts from them.

---

which copyright holder in computer software claimed to be a trade secret may avoid waiving trade secret protection by depositing a limited portion of the code).

Moreover, although the record indicates that Ms. Shell required seminar attendees to sign a contract before receiving the seminar materials, close examination of the contract's terms reveal that attendees were subject only to limited restrictions on their use and, arguably, subsequent dissemination of the materials.  Most notably, the Copyright Notice (incorporated into the contract) restricts attendees from using the seminar materials for "commercial/financial gain," but implies that the attendees are free to make <u>non-commercial</u> use of the seminar handouts and the advice contained therein, such as by employing the strategies themselves, by discussing the strategies and advice with friends or relatives involved in child protective services proceedings, or indeed, by giving their copy of the seminar materials themselves to those friends and relatives.[16]  Moreover, nothing in the contract prohibits an attendee who finds the seminar materials to be worthless from abandoning or discarding the handouts, nor does the contract purport to sanction an attendee who negligently misplaces the materials; in all of these circumstances, any non-attendee who thereafter comes into possession of the materials is under none of the contractual restrictions on their use and dissemination of the materials.  Thus, Ms.

---

[16]     The contract Ms. Shell required attendees to sign expressly prohibits attendees from "distribut[ing] any written handout."  Of course, the "first sale doctrine," embodied in 17 U.S.C. § 109(a), entitles the owner of a particular copy of a work to "sell or otherwise dispose of the possession of that copy" without seeking permission from the copyright holder.  *See generally Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S.Ct. 1351, 1363 (2013) (discussing history and purpose of first sale doctrine).  Thus, it would seem that an attendee would be statutorily permitted to give his or her own copy of the seminar materials to another person, so long as the attendee did not make or retain another copy.  It is by no means clear that Ms. Shell can, though force of contract, extract a waiver of attendees' statutory rights under the first sale doctrine.

However, the contract also states that attendees "shall [not] . . . <u>own</u>" the seminar handouts (except upon pre-paying a license fee).  (Emphasis added.)  If the attendees took possession of the seminar handouts through some mechanism other than ownership, the doctrine of first sale would not apply.  17 U.S.C. § 109(d).  But this provision poses greater questions: if attendees do not "own" the seminar handouts they receive, what is the nature of their possession?  Do they hold them pursuant to a lease from Ms. Shell (and if so, what are the terms of the lease)?  Do they hold the materials as a licensee (and if so, what are the terms of the license)?  Nothing in the record offers a clear answer.

Shell's contractual requirements notwithstanding, there are several vectors by which the seminar materials can readily pass into the public realm, entirely untethered from Ms. Shell's attempted contractual restraints.[17]  *Compare Port-A-Pour, Inc. v. Peak Innovations, Inc.*, 49 F.Supp.3d 841, 868 (D.Colo. 2014) (confidentiality agreement required recipient of trade secret materials to return them to trade secret holder at the conclusion of the parties' business arrangement).

Accordingly, the Court finds that, as a matter of law, Ms. Shell has not shown that the seminar materials enjoy trade secret protection under the Act.

### (b).  Disclosure by Ms. Swallow

For the reasons noted above with regard to the copyright infringement claim, the Court finds that Ms. Shell has failed to come forward with competent, admissible evidence that establishes that it was indeed Ms. Swallow who distributed the seminar materials to Mr. Wiseman.  This, too, warrants entry of judgment on the trade secrets claim to Ms. Swallow.

### (c).  Damages

The Act permits an award of actual damages against a misappropriator of trade secrets, as well as damages reflecting the misappropriator's unjust enrichment.  C.R.S. § 7-74-104.  In appropriate cases, the court can instead award damages in the form of a reasonable royalty.  *Id.*

For the reasons noted above, the Court finds that Ms. Shell has not come forward with any competent evidence establishing that she suffered any actual damages as a result of Ms. Swallow's dissemination of the seminar materials.  Ms. Shell has not adduced any evidence of

---

[17]     Notably, the contract appears to offer attendees the opportunity to license the right to distribute copies of the materials, subject to pre-paying a $300,000 per copy fee to Ms. Shell in advance.  The contract does not appear to reserve a discretionary right in Ms. Shell to reject such a request to license copying and distribution, apparently relying on the steep license fee to discourage such practices.  Nevertheless, Ms. Shell's stated willingness to license further redistribution of the seminar materials for a price (and apparently without reserving the right to impose additional contractual terms on such re-distribution) further weakens her argument that the materials constitute "trade secrets" that she endeavors to protect against wider disclosure.

any benefit that inured to Ms. Swallow from that disclosure, such that damages reflecting unjust enrichment would be suitable, nor has she shown evidence that would suggest that alternative damages in the form of a royalty would be appropriate.  Thus, even if the Court were to find that Ms. Shell otherwise established a claim for misappropriation of trade secrets against Ms. Swallow, she has failed to demonstrate any actual injury resulting from that misappropriation, such that a trial to quantify damages is warranted.

Accordingly, Ms. Swallow is entitled to judgment on the misappropriation of trade secrets claim.

### 4.  **Breach of contract**

Finally, Ms. Shell alleges that Ms. Swallow breached the contract Ms. Shell required all seminar attendees to sign.  To establish a claim for breach of contract, Ms. Shell must show: (i) that a contractual agreement existed between the parties; (ii) that Ms. Shell performed her obligations under the contract or that such obligations were excused; (iii) that Ms. Swallow breached the contract; and (iv) that Ms. Shell was damaged as a result of that breach.  *Western Distributing Co. v. Diodosio*,  841 P.2d 1053, 1058 (Colo. 1992).

### (a).  Existence of a contract

Ms. Shell candidly acknowledges that she cannot produce a contract signed by Ms. Swallow.  Nevertheless, Ms. Shell argues that Ms. Swallow knew of the contract's terms (having read the contract posted in the hallway outside the seminar room) and manifested her assent to those terms by attending the entirety of the seminar.  It is hornbook contract law that a person who, with knowledge of an offer's terms, voluntarily takes the benefits of the offered services without objection is deemed to have accepted the offer and formed a contract.  *Restatement (Second)*, Contracts § 69.  Indeed, Ms. Shell's proposed contract expressly states that an

attendee's attendance at the seminar constitutes agreement to the contract's terms. Accordingly, the Court would find that Ms. Swallow manifested her assent to enter into a contract with Ms. Shell on the terms provided.

(b). <u>Performance/breach</u>

The Court would further find that Ms. Shell performed the terms of the contract by delivering the seminar and materials to Ms. Swallow.

For the reasons previously stated, the Court would find that Ms. Shell has failed to come forward with competent, admissible evidence that Ms. Swallow breached the terms of the contract by distributing the seminar materials to Mr. Wiseman. Accordingly, Ms. Shell has not carried her burden of showing a breach by Ms. Swallow, entitling Ms. Swallow to judgment on this claim.

(c). <u>Damages</u>

For the reasons previously stated, the Court would also find that Ms. Shell failed to demonstrate that she suffered any actual injury as a result of Ms. Swallow's alleged breach of the contract. Because resulting injury is a necessary element of a claim for breach of contract, this defect is also fatal to Ms. Shell's claim.

Accordingly, Ms. Swallow is entitled to judgment on Ms. Shell's breach of contract claim.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court denies Ms. Shell's motion for a default judgment against Ms. Swallow.  The Clerk of the Court shall enter judgment in favor of Ms. Swallow on the claims herein and shall close this case.

Dated this 15th day of January, 2016.

**BY THE COURT:**

_____

Marcia S. Krieger
Chief United States District Judge